FILED
2011 Dec-22  PM 09:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

TOM KUNSTMANN, on behalf    )
of himself and all others       )
similarly situated,            )
                          )
     Plaintiff,            )
                          )
v.                       )     CIVIL ACTION NO.
                          )     CV-08-1969-WMA
                          )     JURY DEMAND
AARON RENTS, INC.  d/b/a    )
AARON'S SALES AND LEASE    )
OWNERSHIP,              )
                          )
     Defendant.          )

**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AGAINST PLAINTIFF TOM KUNSTMANN**

Gregory O. Wiggins
Kevin W. Jent
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
205/314-0500

## I.  INTRODUCTION

The burden of moving for decertification of a collective action rests with the defendant.   With that in mind, the defendant's motion, brief and evidence fall well short of the standard stated in *Morgan v. Family Dollar*, 551 F.3d 1233, 1245-1246, 1263-1264 (11th Cir.) *cert. denied*, 130 S.Ct. 59 (2009), required to decertify a §216(b) opt-in class.   This standard includes numerous factors that should be considered regarding the opt-in class, including:

> 1) disparate factual and employment settings of the individual Plaintiffs;
>
> 2) whether the various defenses available to the defendant appear to be individual to each plaintiff; and a look at
>
> 3) fairness and procedural considerations.

*Morgan* at 1261 (citing *Anderson v. Cagle's* 488 F.3d 945, 953 (11th Cir. 2007). Aaron's motion is based on numerous assumptions, what-ifs and generalities.  As will be shown below, this type of evidence is insufficient to show how the opt-in Plaintiffs are not similarly situated pursuant to § 216(b).

The few dissimilarities Aaron's attempts to rely on are the same categories shot down by the Eleventh Circuit in *Morgan*.  The Eleventh Circuit rejected a nearly identical arguments in *Morgan*, holding that not every duty or responsibility need be "identical" and that as many 10% to 20% of Store Managers' duties may differ

1

without requiring decertification.  *Morgan*, 551 F.3d at 1262-1263 & n. 44, 1270-1271; *see also id.* at 1257 n. 29 (finding Store Managers similarly situated despite the fact that "[s]ome district managers allow their store managers to . . . hire candidates for hourly sales associates positions without obtaining district manager approval", while "[m]ost store managers . . . obtain the district manager's approval before hiring or firing hourly employees.").

What Aaron's cannot escape from is the fact that it made a decision to classify all General Managers as exempt, regardless of their store size, location, salary, or any other factor. PX 20 - Lawrence Depo pp. 30-31.  This was the same scenario presented in *Morgan*.  *See* 551 F.3d at 1263.  Also just like *Morgan*, all Aaron's General Managers operate under the same job description and extensively controlling policy manual.

Aaron's asserts that it has different defenses for each Plaintiff.  This too is a red herring.  Aaron's motion, once all of the extraneous, irrelevant arguments are disregarded, simply asserts that its defenses to the plaintiffs' claims are based on the administrative and executive exemptions to the FLSA and the combination exemption.  It also claims the highly compensated exemption for 4 of the 200+ opt-ins, however, the application of this defense to such small sampling of the class does not prohibit collective treatment.  Finally, Aaron's claims that these General Manager

fall under the retail compensation exception to the FLSA overtime requirements.  As will be shown, this "defense" does not apply to Aaron's General Managers and even if it did, any examination of this exception can be conducted on a collective basis.

## II.  PLAINTIFF KUNTSMANN AND THE OPT-IN PLAINTIFFS ARE SIMILARLY SITUATED

Contrary to what Aaron's asserts, the General Managers at issue in this case are similarly situated for purposes of maintaining a §216(b) collective action.  As with any case, a determination of similarly situated in this context ultimately requires an examination of the Plaintiffs' job duties.  *See Morgan* at 1262.  The Eleventh Circuit rejected a nearly identical argument in *Morgan*, holding that not every duty or responsibility need be "identical" and that as many 10% to 20% of Store Managers' duties may differ without requiring decertification.  *Morgan*, 551 F.3d at 1262-1263 & n. 44, 1270-1271; *see also id.* at 1257 n. 29 (finding Store Managers similarly situated despite the fact that "[s]ome district managers allow their store managers to . . . hire candidates for hourly sales associates positions without obtaining district manager approval", while "[m]ost store managers . . . obtain the district manager's approval before hiring or firing hourly employees.").  A review of the Aaron's General Manager job duties reveals that they are in fact similarly situated and the defendant's Motion for Decertification should be denied.

3

## A.    Kuntsmann And All General Managers Are Subject To The Same Job Description

As a starting point in this analysis, Aaron's has set up the same position description for General Managers listing their basis function, reporting requirements, primary responsibilities, position requirements, pre-employment requirements and dress code.  See PX 21 - General Manager Job Description.  While not dispositive of the primary duty issue, the company's decision to provide a single position description for all company General Managers clearly indicates that the company believed that all General Managers performed the same duties, had the same responsibilities and were held to the same standards regardless of store size, store volume, store location or any of the other factors raised by Aaron's as evidence in dissimilarity.  In other words, a single position description for all General Managers employed by the company shows that Aaron's expects each and every General Manager to perform the same duties and carry out their employment in a similar manner.  This evidence supports Plaintiffs contention that they are similarly situated.

The instant case resembles the facts presented in *Morgan* where the Eleventh Circuit found that the Plaintiff Store Managers were similar in "their universal classification as store managers with the same job duties."   551 F.3d at 1262. Aaron's, like Family Dollar, has universally classified all General Managers with the

4

same job duties and responsibilities.

### B. Kuntsmann and All Of The Opt-In General Managers Were Subject To The Same Controlling Policies and Procedures Manual

Just like the Family Dollar Store Managers in *Morgan*, Kuntsmann and all of the other Aaron's General Managers were closely controlled by the company's Pathway Manual which set out in great detail how General Managers and other employees were to carry out store operations.

All General Manager's duties and responsibilities are uniform from store to store because the company-wide policy manual regiments every store's operations in the same way as found in *Morgan*, 551 F.3d at 1249("Even as to the assigned management tasks, such as paperwork, bank deposits, and petty cash, the store manual strictly prescribes them."); *Morgan*, 551 F.3d at 1249 ("And district managers closely scrutinize store managers to ensure compliance with the manual and corporate directives.").[1]

The defendant has very strict policies and procedures which control every

---

[1] The Eleventh Circuit also found that "the jury reasonably could have found that Family Dollar executives knew that store managers spent most of their time performing manual, not managerial, tasks, that corporate manuals micro-managed store managers' performance of those tasks, that the 380 district managers closely supervised their store managers, and that store managers had little discretion or freedom from supervision."  *Morgan*, 551 F.3d at 1280-1281.

5

aspect of a general managers job duties and responsibilities.[2] The policy and procedure manual is the Pathway." (Plaintiff will be submitting Pathway I as Joint Exhibit #1 and Pathway II as Exhibit #2 to Summary Judgment and Decertification). Not surprisingly, the defendant has ran away from Pathway.  The plaintiff testified that he was required to follow the policies and procedures laid out in Pathway. Kunstmann Depo. I, 21-24; Kunstmann II, 81, 87-88, 150-155: Doc.## 14-2 and 43-3; Exhibit #1, ¶8.

Pathway controls the following:[3]

- End of Day Process – page 79 – Pathway dictates that there are 21 items that are to be completed with specific instructions that MUST be followed. Process is the same for ALL stores – no exceptions noted in the manual, Manual doesn't say it depends on the situations, or depends on the store it specifically states what is expected out of ALL stores.

---

[2] Pathway is applicable to all stores regardless of the location or the size of the store. When a new Pathway goes into affect it is distributed to all stores. (Exhibit #8, E-mail of 10/26/10) The defendant admitted this fact in its opposition to plaintiff's motion to facilitate notice. (Doc. #82, page 28); *See also* PX 23 - Moldano Depo pp. 104-105.

[3] The list of job duties and responsibilities is not all inclusive. As the Court will clearly realize upon examining Pathway, Aaron controls every minute aspect as to how a store is to operated and the general manager has little, if any, discretion when it comes to determining which customers are leased to, which customers are offered assistance when they get behind on their lease agreements, where the merchandise is displayed, what merchandise can be displayed, the price of new and returned merchandise, the number of employees that are allowed to be employed in a store, the hours the employees can work, the rate of pay employees are payed, which employees can be terminated, demoted and/or promoted and numerous other job duties.

- bank deposits – – pages 58, 79-83 – rules to be followed for store in making bank deposits are set out in Pathway — no exception – Bank Deposits – the term MUST is repeatedly used and is capitalized and bolded when describing the bank deposit procedures to be followed.[4]

- customer complaint resolution – p.23 – resolution must be reached within 72 hours. If customer opportunity (complaint) is sent to the store by 3rd party, it is immediately to be forwarded to the Divisional office and the RM notified. Failure to do so can result in termination

- security controls –p.24 –new associates that are approved as key holders should not be given keys or alarm until approved by RM.

- greeting customers – p.28 – customers should be greeted within 3 seconds, approach the customer with a clip board that includes ADVO, Pen, Calculator and Sweepstakes entry form.  After introducing yourself to the customer every customer should be asked 3 specific questions.

- Pages 23-49 --The Y.E.S. Program (The customer service program became known as YES (You Expect Satisfaction) --Six Components to the YES program --every store is expected to meet customers in a certain

---

[4]The repeated use of the word "MUST" throughout Pathway establishes that Pathway is more than just a guide.

way –very specific on how customers are to be greeted and handled from the moment they walk into the store

- refreshment center – p.32 – identifies specific items that should be in center, when to clean the refreshment center etc.;

- how to handle bed bugs on returned merchandise – p.45

- inspecting returned merchandise for infestation – p 46

- customer accounts management – p. 51 – controls when customers may renew their rental agreements, explains when a General Manager may offer the customer a new lease on life.

- quality control follow-up call – GM must call each customer that obtains a new agreement the next business day;

- merchandise presentation – p.142-159 – Aaron's has established guidelines for the presentation of merchandise in the showroom – specific controls and specificity as to where all merchandise is to be placed in the store.

- end of the day checklist – p. 161 – identifies 13 items that must be completed before leaving the store.

- store appearance, housekeeping – 133-137 – general manager responsible for store appearance – examples of general manager job

8

duties responsibilities: set timer settings, check back lighting nightly, thermostat control (summer 72 degrees, at close of business 80 degrees – winter 72 degrees, at close of business 64 degrees), clean parking lot oil leaks, weed control when needed, clean restrooms as needed;

- store staffing guidelines – p. 199-200 – the number of employees employed in a store is determined by corporate headquarters and is based on the number of customers  that store has obtained.

- overtime – p. 232 – overtime hours in excess of budgeted hours must be approved by the Regional Manager

- Page 86 – Petty Cash – Petty cash used to purchase ONLY certain items identified in Pathway, any deviance the RM must be contacted for approval

- Pages 135-138 – Pricing Merchandise – for merchandise that is returned to store who is responsible for determining the price of the merchandise (RM, p. 136)

- Page 139 – Merchandise presentation

- Page 184 – Ordering Merchandise –GM and SM should work together

- Page 263 – Counseling associates –  "the associate and the member of management conducting the counseling must sign ...: Doesn't state GM

must perform counseling

Every aspect of the stores operation is outlined in Pathway. Even the smallest minute

detail is covered in Pathway. All employees in the store were required, or at least

expected to, follow Pathway.

The General Manager could not even decide what items could be in the

refreshment center or even what items could be on his/her desk or the walls in the

General Manager's office.

The Refreshment Center

1.    A 12 cup coffee pot is recommended and should be located at the
      end of the counter on top of the dorm refrigerator or lateral file if
      your dorm refrigerator is under your counter. Place paper towels
      under the coffee pot to catch any spills. Coffe should be made
      twice a day; once at 9:00a.m. and be replaced at 2:00p.m.. Never
      offer customers a stale cup of coffee.

2.    Place the necessary condiments and accessories near the coffee
      pot. These items should include: Styrofoam cups, napkins, coffee,
      creamer, Equal or Sweet & Low, sugar and stirrers. ... The coffee
      bar should be monitored regularly and kept clean. The coffeepot
      will be cleaned every week with water and vinegar....

3.    Bottled water is also offered to our customers. Serve 6-8 ounce
      bottles. Purchase four cases to get started....As a courtesy, when
      giving a customer a bottle of water, wrap a napkin around it
      before handing it to him or her.

Offices

a.    clean and organized
b.    set up properly

10

    c.      Nothing on walls except authorized documents
    d.     Nothing taped to desk, walls, windows or file cabinets
    e.      All desks cleaned out and empty except GM
    f.       No computer in GM's office
    g.     Correct furniture in each office
    h.     No merchandise to be used as office furniture

Hospitality Center

    a.      Cleanliness
    b.      Fully stocked
    c.      Individual packets of creamer, sugar, Sweet & Low and Equal in canisters at the end of the counter on top of dorm refrigerator or lateral file if your dorm refrigerator
    d.     Bottled water unboxed and faced in dorm refrigerator (minimum of 4 cases in the store at all times)
    e.      Extra condiments and coffee supplies are kept either in the lateral file at the end of the counter (if not using dorm refrigerator to put your coffee pot on) or in the lateral file in the closing room.

There are hundreds of other examples as to just how Pathway controlled the how the store was to be operated and maintained. For example, areas inside and outside of the store, the company vehicles, the floors, wall art, lighting, sound, smell, restrooms, counters, jewelry case, closing room, appliance center, electronic center, dining sets, bedrooms, living rooms, computer displays, warehouse, certification zone and security rooms are specifically controlled by Pathway. Pathway I, pages 280-291. The General Manager has no discretion when it comes to setting up and maintaining the store. Pathway goes as far as to state the chairs in the living rooms are "to be set at an angle facing toward the set next to the end table opposite the loveseat (Not at

11

a 90 degree angle of the sofa because it is sold separately).  Pathway I,  page 289.

The general manager could not even determine what setting the thermostat should be set on. These are the same exact type of policies that the 11th Circuit found in *Morgan* which disqualified the store manager from qualifying for the executive exemption.

Plaintiff testifies that he was required to train from and follow Pathway. Exhibit #1, ¶8. The defendant does not deny this fact but instead runs from the policies contained within Pathway.  Pathway is in evidence and the policies contained within are the same policies that the Court of Appeals found to control "every detail of how the store is run is fixed and mandated through Family Dollar's comprehensive manuals." *Morgan*, 551 F.3d at 1248.

The evidence in common between *Morgan* and the current case establishes that:

> There was overwhelming evidence that store managers spent only 10 to 20% of their time on exempt (i.e., managerial) work. Plaintiffs presented evidence that store managers rarely exercised discretion because either the operations manuals or the district managers' directives controlled virtually every aspect of a store's day-to-day operations. The manuals and other corporate directives micro-managed the days and hours of store operations, the number of key sets for each store, who may possess the key sets, entire store layouts, the selection, presentation, and pricing of merchandise, promotions, payroll budgets, and staffing levels. The manuals even instruct store managers on the smallest details, such as how to arrange clip boards, what items go in each of the four drawers of

12

the single file cabinet, and how to remove spots and chewing gum from store mats.

*Morgan*, 551 F.3d at 1270.  Additionally, the evidence here is the same as that found sufficient to establish that "district managers (regional) closely scrutinize store managers to ensure compliance with the manual and corporate directives."*Morgan*, 551 F.3d at 1249.

The corporate policy manuals now before the Court are the same as those that were the basis for the Court of Appeals finding that "Family Dollar's corporate office issues instruction manuals with operating policies that apply uniformly to all stores nationwide. No matter the size of the store or the district, every detail of how the store is run is fixed and mandated through Family Dollar's comprehensive manuals." *Morgan*, 551 F.3d at 1248.   Indeed, General Manager's discretion is so constrained that they do not even have the power to decide how to place items on their own desk. or what temperature the thermostat in the store should be set on.  The corporate directives that are part of the evidence here are the same ones that the Court of Appeals found sufficient to establish that:

> The tiniest of details are governed by the manuals. For example, the manual's "Clip Boards in the Office" page details how a store must structure its clip boards.  Even the four drawer cabinets, located in every store, are organized identically.   The manual also has a subsection on "Break Area and Coffee Pots."  It states that "Appliances such as coffee pots, microwave ovens, refrigerators, etc., must be approved by the

13

District Manager. Whoever makes the coffee is responsible for unplugging the coffee pot when not in use." The manual instructs: "Do not use the on/off switch as this can be left on by mistake and create a fire hazard. Make periodic checks throughout the day and before closing to assure that it has been unplugged."

For example, the top row must include, from left to right, Monthly Promotional Programs, Ads and Ad Planners, Pending Schematic and MSI Label Changes, Current Store Order and Stop Shipments, DM Notes and Latest DM Audit, Messages and EDLP Notes, and a Housekeeping Checklist.

Drawer One contains the petty cash box, bank deposit bags, register keys, extra keys, stamps, and an extra till bag. Drawer Two houses items such as unauthorized price change reports and area change reports. Drawer Three holds the open direct summary file, packing slips, credit memos, direct shipment notifications, and processed billing summaries. Drawer Four has messages, payroll, personnel, drug screening, resignation verification, employee evaluations, warning forms, blank applications, completed applications, and a variety of other forms.

The same evidence is also before the Court which established that Family Dollar's Store Managers "lack discretion over the store's merchandise, selecting prices, sales promotions and layouts" which were "all set by the home office and district managers." *Morgan*, 551 F.3d at 1250 & n. 9. Such evidence showed that:

Store managers lack discretion over the store's merchandise selection, prices, sales promotions, and layouts-all are set by the home office and district managers. For example, each store is provided a schematic layout and diagram of the store which shows (1) where each shelf must be, (2) what product goes on each shelf, (3) how all merchandise is to be displayed, (4) how all signs, merchandising, and display information is to be used, (5) how each "end cap" (the end of an

14

aisle or gondola) should be displayed, and (6) what promotional product goes on the end cap. Every month, corporate headquarters mails each store a promotional programs booklet that contains the monthly planning calendar and a number of merchandise programs. The manual admonishes that "any deviation from the company program must have the District Manager's approval."

As provided in the manual, Family Dollar's computer system replenishes "basic merchandise" items. A register informs the system of every sales transaction at the store. Based on prior selling history and the current inventory level, the system determines the amount of goods needed to maintain the "maximum on hand allowance." In addition, each store orders merchandise on a preassigned order day, which is delivered on a preassigned "truck day."

*Morgan v. Family Dollar*, 551 F.3d 1233, 1250 & n.9 (11th Cir. 2008).

Even the minor paperwork that Kunstmann and the Opt-In Plaintiffs handled was also handled just as much by hourly employees, involved no discretion, and was controlled by the strict oversight of the Regional Manager and detailed instructions in Pathway. Pathway I, pp. 38-90, 117-175; Exhibit #1, ¶¶ 7, 8, 11, 12, 15, 21. The same evidence was found sufficient to establish that "[a]lthough Family Dollar emphasizes its store managers had management-type paperwork to do (such as bank deposits and accident and payroll reports), Family Dollar ignores that how to do each task was prescribed by the manual and district managers and store managers had little discretion, under Plaintiffs' evidence, as to those tasks." *Morgan*, 551 F.3d at 1271 n. 58.

Store Manager's discretion over store keys, bank deposits, petty cash and store operating hours was found by the Court of Appeals to be inconsistent with the managerial discretion of a *bona fide* executive on the basis of the same evidence as is now before the Court.  *Morgan*, 551 F.3d at 1249 ("Even as to the assigned management tasks, such as paperwork, bank deposits, and petty cash, the store manual strictly prescribes them.").   The Court further found:

> Store managers must follow strict rules regarding store keys, bank deposits, petty cash, and store operating hours. For example, the manual requires there be $300 in petty cash, divided into $200 in the petty cash-box for making register change, and $50 in beginning funds for each of the two registers. In some cases, the petty cash amount may be increased due to the volume of business with the district manager's and regional vice-president's approval and notification to the Cash and Sales Department. The manual indicates that "[t]he amount of the store's Cash Accumulation is to be set by the District Manager .... [and] should be posted in the petty cash box using the 'Cash Accumulation Card.' " Store managers have the same paperwork to do and time frame in which to do it.

*Morgan*, 551 F.3d at 1251.

## C.   Kunstmann and the Opt-In Plaintiffs Operated Under Strict Direction of the Regional Managers

The Regional Manager ran the store and exercised all of the true management authority and discretion. Exhibit #1 ¶¶ 7,8, 10, 12, 12 15, 21.  Aaron has presented no evidence to the contrary. Hooks' declaration does not even mention the word "Pathway."  Kunstmann and the other General Managers have presented testimony

16

that the Regional Manager, corporate and/or Pathway dictated and controlled:

- decided starting pay and pay raises;
- decided to allow overtime;
- decided whether to terminate an employee;
- decided who to hire and/or promote;
- approved employees' work schedules;
- decided what supplies the store may order beyond the basics;
- decided the number of employees should be employed in the store
- controlled the  store's display of merchandise;
- assigned tasks to store employees;
- evaluated store employees' performance.
- assisted in determining employees' work schedules;
- handled employee discipline;
- hired store employees;
- controlled the stores thermostat;
- controlled the stores scents and lighting;
- controlled employees pay;
- controlled the stores hours;
- charge offs of bad debt;
- exchange of non-repairable merchandise out on lease
- 

Exhibit #1 to Kuntsmann Summary Judgment Response, ¶¶8, 11, 12.

Kunstmann and the other Opt-In Plaintiffs have submitted the same evidence which the Court of Appeals found sufficient to establish that "District/Regional managers uniformly run their stores through store visits, daily emails and telephone calls with instructions to store managers..." *Morgan*, 551 F.3d at 1255.

Kunstmann's and the Opt-In Plaintiffs' evidence of the Regional Manager's control over daily store operations is the same as the evidence which the Court of Appeals found sufficient to prove that:

17

The few decisions not mandated by the manuals and corporate headquarters are vested in the district manager. These decisions include the power to change store hours, close for bad weather, approve changes to store layouts, establish all employees' initial rates of pay, approve all pay raises, set payroll budgets, control the total labor hours allocated to each store, approve the hiring and firing of assistant managers, and even approve the use of appliances such as coffee pots. Even when a store manager exercised discretion in scheduling employees for the week, she did so within the strict constraints of mandatory store hours, a limited payroll budget, a prohibition on overtime work by hourly employees, and a staff scheduler. This evidence supports a reasonable jury finding that Family Dollar's store managers had few, and infrequently exercised, discretionary powers.

As to the store managers' relative freedom from supervision, this factor likewise favors Plaintiffs. The evidence showed that district managers (1) supervised 10 to 30 stores, (2) headed the store team, (3) were responsible for enforcing the detailed store operating policies, (4) closely reviewed each store's inventory orders and net sales figures, (5) closely monitored each store's weekly payroll, (6) controlled employee hourly rates and pay raises, (7) routinely sent to-do lists and emails with instructions to store managers, (8) closely supervised the selection, pricing, sales, displays, and ordering of merchandise, and (9) closely supervised every aspect of store operations. Store managers had little freedom from direct supervision. Indeed, ample evidence showed that the combination of sweeping corporate micro-management, close district manager oversight, and fixed payroll budgets left store managers little choice in how to manage their stores and with the primary duty of performing manual, not managerial, tasks.

*Morgan*, 551 F.3d at 1254-1255, 1270-1271; *see* Exhibit #1 ¶¶ 19, 20, 22, 23.

### D.    Kuntsmann and the Opt-In Plaintiffs Share The Same Primary Duty

As a result of being controlled by the same job description and rigid, all-encompassing corporate policies, Kuntsmann and the other Opt-In General Managers

share a remarkably high degree similarity of there actual job duties and responsibilities.  Under Eleventh Circuit precedent, this high degree of similarity makes this case appropriate for collective action treatment.  *See Morgan generally* pp. 1260-1265.  In *Morgan,* the Court of Appeals recognized that there was some degree of difference between the Store Managers because some were spending 80% of their time on non-exempt, manual labor while others were spending 90% , or even as much as 95%, but the Court held that this was sufficient similarity to permit the jury to make a single, across-the-board determination of whether Store Manager's "primary duty" was management because that determination depends upon a balance of multiple factors in which no one duty or percentage of time is controlling. *Morgan*, 551 F.3d at 1269-1271.

### 1.    Aaron's General Managers Cannot Hire

Tom Kuntsmann did not have the authority to hire employees for the CAM, Sales Manager, MT or CSR positions at the store where he was General Manager without the approval of the Regional Manager.  PX 1 - Kuntsmann Depo pp. 75-78. This same lack of ability to hire was shared by the other General Managers who opted into this case.[5]  *See* PX 2 - Bashart Depo p. 103-104; PX 3 - Clifton Depo pp. 75-76,

---

[5]Even if a couple of General Managers somehow did against Aaron's hiring practices and policies on rare occasions to hire PTs and CSRs, they still could not hire Mts, SMs or CAMs without Regional Manager approval.

78, 90; PX 4 - Duncan Depo pp. 135-137; PX 5 - Torres Depo pp. 100-101, 103; PX 6 - Vitale Depo p. 64, 136, 139; PX 7 - R. Williams Depo pp. 63, 67, 83; PX 8 - Stocksill Depo pp. 112-113, 120; PX 9 - Pettigrew Depo pp. 78-80, 83; PX 10 - Lewis Depo pp. 108-111, 113, 115; PX 11 - Presswood Depo p. 67-69, 71; PX 12 - Munoz Depo pp. 151-152, 158; PX 13 - Storm Depo pp. 73-76; PX 14 - Sickles Depo pp. 146-149; PX 15 - Wiers Depo p. 114; PX 16 - Griffin Depo pp. 80-81; PX 17 - Richardson Depo pp. 116, 121; PX 18 - S. Williams Depo pp. 278.

In addition, although paying lip service to the concept, Aaron's provides no evidence that any hiring recommendations made by General Managers were given any particular weight. Certainly there is nothing in writing in Aaron's extensive policy and procedures handbook that requires Regional Managers to give any particular weight to the hiring recommendations of the General Managers

Aaron's attempts to distinguish the various levels of authority which General Managers had to hire employees for these stores are sorely lacking.[6]  The variations, if any, were minuscule.  However, even if there had been any variation that would

---

[6]In addition, Aaron's has mischaracterized the testimony of some Plaintiffs in this area. For example, Opt-In Clifton testified that a Sales Manager was hired for his store, but never specifically testiifed that **he** made the decision without any approval from a Regional Manager. Clifton Depo pp. 74-79.  In fact, Clifton testified that only the Regional Manager had the authority to promote someone the Sales Manager position.  Clifton Depo p. 82.  The other Plaintiff mentioned, Reagan Griffin could not hire Sales Managers, CAMs or Manager Trainees for the store.  Griffin Depo pp. 86-87.

still not be sufficient to defeat decertification in light of the fact that hiring authority was severely limited for the General Managers and mostly belonged to the Regional Managers. *See Morgan* at 1256, 1262 (upholding jury verdict and denial of decertification in a case where Store Managers could not hire Assistant Managers on their own, even though some Store Managers had varying degrees of involvement in hiring for other positions.).

2.   **Aaron's General Managers Cannot Terminate Employees**

Tom Kuntsmann could not terminate employees at the store where he was a General Manager. Kuntsmann Depo pp. 80-86. Instead, this authority belonged to the Regional Manager. Kuntsmann Depo pp. 80-85. Likewise, other General Managers lacked the ability to terminate employees, instead having to rely on Regional Managers to make the decisions regarding this important store managerial function. *See* Bashart Depo pp. 114, 117-119, 122; Clifton Depo pp. 67, 83, 86, 161; Torres Depo pp. 107-110, 115; Vitale Depo pp. 59, 141, 145, 149, 284, 286; R. Williams Depo pp. 143-144, 146-149; Pettigrew Depo pp. 86, 88, 90-91; Lewis Depo pp. 119-121, 134; Presswood Depo pp. 79-85; Munoz Depo pp. 176-179; Storm Depo pp. 79-80, 83-85, 87; Sickles Depo pp. 149-150; Wiers Depo p. 101; Griffin Depo pp. 69, 112; S. Richardson Depo pp. 131-134; S, Williams Depo p. 125.

Aaron's provides no evidence that any termination recommendations made by

General Managers were given any particular weight.  Certainly there is nothing in writing in Aaron's extensive policy and procedures handbook that requires Regional Managers to give any particular weight to the termination recommendations of the General Managers.

Furthermore, Aaron's evidence on this subject does not merit decertification. First, contrary to Aaron's assertions, Danny Clifton did not testify that he had complete authority to terminate CSRs.  In fact, he testified completely opposite. Clifton Depo p. 84:12-14.  Plaintiff's Edwards testimony regarding her authority to terminate a CSR without Regional Manager approval is confusing at best in light of her testimony that she could not even write up a CSR without first obtaining Regional Manager approval.  Edwards Depo p. 90:5-8.

The fact of the matter is that Aaron's General Managers overwhelmingly could not terminate individuals from these stores and if they were involved in the process they were first required to obtain approval from their General Manager.  There is no noticeable variation in this authority and certainly not enough of a variation to require decertification. *See Morgan* at 1263, n. 42 (noting that Family Dollar Store Managers were all limited in their ability to fire Assistant Managers, while not all were limited in their ability to fire other employees).

### 3.   Aaron's General Managers Cannot Discipline Employees Without Regional Manager Approval

As a General Manager, Tom Kuntsmann could not discipline employees at the store where he worked without Regional Manager approval.  Kuntsmann Depo pp. 80-86.  The other General Manager Opt-In Plaintiffs shared this same lack of authority.  *See* Bashart Depo pp. 117-118, 120, 122; Clifton Depo pp. 34, 85, 87; Torres Depo pp. 107-110, 114; Vitale Depo pp. 143, 148; Stockstill Depo pp. 59-60; Pettigrew Depo p. 42; Lewis Depo p. 118, 121; Presswood Depo p. 80, 82-86; Storm Depo pp. 40, 81-84, 86-88; Sickles Depo pp. 71-73, 189-190; Wiers Depo pp. 100-101, 125; Griffin Depo pp. 70, 113.

Aaron's provides no evidence that any discipline recommendations made by General Managers were given any particular weight.  Certainly there is nothing in writing in Aaron's extensive policy and procedures handbook that requires Regional Managers to give any particular weight to the discipline recommendations of the General Managers.  Once again, Plaintiffs have presented ample evidence that what little authority any of them had as far as discipline  was severely limited by the Regional Manager who was ultimately responsible for administering disciplines in the store.  Furthermore, to a person, the Plaintiffs testified that they could not give the ultimate form of discipline, termination, without Regional approval.

23

###### 4.    Aaron's General Managers Did Not Have The Authority To Set The Store Schedule.

Kuntsmann and the other General Manager Opt-Ins did not have the final authority to set the store's working schedule.  Kuntsmann Depo pp 98-100.  The schedule was made off of a template provided by the company or the Regional Manager.  Kuntsmann Depo pp. 98-100; Bashart Depo p.138; Clifton Depo p. 96 (schedule prepared by the RM on a weekly basis); Duncan Depo p. 105; Vitale Depo p. 174; R. Williams Depo pp. 56, 87; Stockstill Depo p. 137; Pettigrew Depo pp. 102, 104-105, 109-110; Lewis Depo p. 144, 148, 151; Spears Depo p. 130-131; Presswood Depo p. 96, 99; Munoz Depo p. 86; Storm Depo p. 95, 98-99; Sickles Depo p. 102-104; Wiers Depo pp. 55, 132-133; Griffin Depo pp. 118-119; Richardson Depo pp. 158-160; S. Williams Depo pp. 169, 177; Chase Depo pp. 143-144.[7]

Furthermore, all stores were subject the company mandated guidelines that required certain positions to work a certain number of hours per week.  For example, a CAM was required to work 45 hours per week, while a SM was required to work 45 hours per week. JX 1 Pathways I p. 199 - Store Staffing Guidelines.  The General

---

[7]Aaron's attempts to use Chase as an example of a Store Managers discretion to set the schedule.  Def. Brief pp. 23-24.  They point to Chase's testimony that while 2 of the 3 Regional Managers filled out the store's schedule, but the 3rd allowed him to fill it out as evidence of dissimilarity.  *Id.*  What Aaron's fails to tell the Court is that Chase then testified that even thought the 3rd Manager allowed him to fill out the schedule, he was still required to use the company template to prepare the schedule.  Chase Depo p. 144.

Manager did not have authority to vary the hours these employees worked. *Id.* In fact the Pathways Manual states that "***Regional Management*** may consider the factors involved in individual stores and vary from this guide. ***Any deviations from this guide require approval from the President***." *Id.*

It is clear that all Aaron's General Managers were severely limited in their authority to make out schedules. These limits were imposed by either the Regional Manager, the company template, or the Pathways manual which dictated the number of hours certain employees were to receive. Such evidence is sufficient to support continued certification of this class. *See Morgan* at 1271(noting that "[e]ven when a store manager exercised discretion in scheduling employees for the week, she did so within the strict constraints of mandatory store hours, a limited payroll budget, a prohibition on overtime work by hourly employees, and a staff scheduler. This evidence supports a reasonable jury finding that Family Dollar's store managers had few, and infrequently exercised, discretionary powers.").

### 5. Aaron's General Managers Do Not Evaluate Or Set Pay Of Other Store Employees

Kuntsmann did not provide evaluations of store employees and played little role in employee evaluations. Kuntsmann Depo pp. 66, 69. That responsibility belonged to the Regional Manager. Kunstmann Depo p. 66. Furthermore, Kuntsmann did not

make decisions regarding pay.  Kuntsmann Depo pp. 69-70.  Instead, those decisions were made at a level above the General Manager.  *Id.*

Similar to Kuntsmann's involvement in the evaluation process, the other Opt-In General Managers also played little to no role in providing evaluations of employees.  *See* Bashart Depo pp. 89-91; Clifton Depo pp. 64, 158; Torres Depo pp. 87-89; Vitale Depo p. 123; R. Williams Depo p. 48; Stockstill Depo p. 102-103; Pettigrew Depo pp. 71-73; Lewis Depo pp. 97, 99-100; Presswood Depo pp. 57-60; Munoz Depo pp. 129, 131; Storm Depo pp. 65-66; Griffin Depo pp. 104-105; Richardson Depo pp. 103-104; S. Williams Depo pp. 86-88. The Regional Manager was the person responsible for store employee evaluations.  *Id.*

Also, like Kuntsmann, the Opt-In General Managers did not have the authority to give pay raises or set pay for store employees.  *See* Bashart Depo p. 94; Clifton Depo p. 69; Torres Depo p. 91; Vitale Depo pp. 124-127; R. Williams Depo pp. 50, 52; Pettigrew Depo p. 73; Lewis Depo p. 101; Spears Depo pp. 111-112; Presswood Depo pp. 59-60; Munoz Depo pp. 132, 136; Storm Depo p. 66; Wiers Depo p. 105; Griffin Depo p. 105; Richardson Depo pp. 104-105; S. Williams Depo pp. 87, 208. This responsibility also lay with the Regional Manager.  *Id.*

The evidence on these issues also point to one overwhelming conclusion - the Regional Managers were in charge of the evaluation and raise process.  They did this

by either filling out the evaluations themselves or by having the General Manager fill out the written evaluation and submit to them it for approval and correction.  Even the examples submitted by the defendant in footnote 33 show extensive Regional Manager involvement in the process.  *See e.g.,* Duncan Depo pp. 56-57(General Manager and Regional Manager fill out evaluations together); Lewis Depo pp. 63-64(Regional Manager changed the evaluation presented by General Manager; Chase Depo pp76-77(General Manager prepared written evaluations on employees and sent them to Regional Manager who would change them); Gillig Depo pp. 121-122(Written Evaluations given to Regional Manager, not to store employees); Munoz Depo pp. 129-130(General Manager only allowed to do written evaluations once and even then only allowed to give them to the Regional Managers, not to the store employees).  The same is true for pay raises where no General Manager testified that they could give a pay raise.  Some would recommend a pay raise, some would not.  The use of the term "recommend" in this sense is a little misleading.  One can recommend anything, it's the weight which the recommendation is afforded which is important. There is no evidence that those recommendations were given any particular weight.  In any event, this duty was outside the General Manager's authority and responsibility and like the other true managerial duties at Aaron's, it ultimately belonged to the Regional Manager.

27

**6.     Kuntsmann and the Other General Managers Played Little Role in the Training and Development of Employees**

Kuntsmann played very little role in training employees while a General Manager. Kuntsmann Depo pp. 32-33. Instead, employees underwent on-line training and had responsibility for meeting their own deadlines. *Id.* Other General Managers had a similar experience with training of store employees and provided little to no training assistance. *See e.g.,* Bashart Depo pp. 52, 68; Clifton Depo pp. 37, 46, 61, 64, 89; Duncan Depo pp. 38-39; Torres Depo pp. 55, 68; Vitale Depo pp. 70, 79; Stockstill Depo pp. 60-61, 73, 79, 84; Munoz Depo pp. 67, 79, 104-105, 107**;** Storm Depo pp. 41, 50-51; Sickles Depo pp. 52, 81, 112, 116-117, 123; Wiers Depo pp. 45-46, 56; Griffin Depo p. 43; Richardson Depo pp. 66-67, 83-84, 91, 130, 142; S. Williams Depo pp. 68, 106.

Aaron's evidence on this issue often misconstrues the record. For example, ti states that Opt-In Torres testified that he trained employees during the Friday morning meetings. Defendant's Brief p. 27. What Torres actually testified was that the training in those meetings was "more like relaying information" they had been told by the Regional Manager. Torres Depo p. 69. Torres also testified that he did not develop employees in the store because he "never had a chance to." Torres Depo p. 68.

What is clear from the record before the Court that what extent General

Managers did train was a minimal portion of the time they spent working and mostly could have been considered "on-the-job" training or leading by example. In other words, "I've still get to finish my job and since we share similar duties you should just watch me," training. Such training is not managerial in nature. Furthermore, these duties were shared with non-exempt employees who also trained new employees.

### 7. Kuntsmann and the Other Opt-In General Managers Did Not Set Sales Goals For Store Employees

Kuntsmann did not have the authority to set sales goals for the employees in the store. Kuntsmann Depo pp. 49, 53. The other Opt-In General Managers testified to similar lack of responsibility in this area. *See* Bashart Depo. 50; Clifton Depo pp. 49, 53, 94; Torres Depo pp. 71, 75; Vitale Depo pp. 101, 111, 115; Presswood Depo pp. 45-46, 49-49, 51, 53; Munoz Depo pp. 70, 107, 113, 118, 139; Storm Depo pp. 52, 55, 58; Sickles Depo pp. 96. 100, 131; Wiers Depo p. 81; Griffin Depo p. 73; Richardson Depo pp. 87, 91, 95; S. Williams Depo pp. 101, 145-146, 203; Stockstill Depo pp. 82-83, 88, 99; Pettigrew Depo pp. 59, 61, 65, 67, 195; Lewis Depo pp. 71, 73, 79, 92; PX 19 - Spears Depo p. 44.

The defendant mischarachterizes the testimony of several opt-ins in an attempt to show dissimilarities among the plaintiffs. What it cannot hide from is the fact that General Managers did not have discretion to set these goals on their own. They were

either set by the Regional Manager, the company, or in conjunction with the Regional Manager, the Sales Manager and the CAM. General Manager's did not set these goals on their own. For example, Chase consistently testifies that employee goals were set with the help of all 3 of his Regional Managers. Chase Depo pp. 63-64. Regardless, the overwhelming majority of General Managers who testified stated that they did not solely set goals and most testified that they were controlled from the Regional level or above.

> 8. **Kuntsmann and the Other Opt-In General Managers Did Not Delegate Work To Other Employees and Did Not Direct the Work of Other Employees**

Kuntsmann testified that he spent the majority of his time in the office and therefore did not direct the work of employees in the store. Kuntsmann Depo p. 97. Mostly any direction was handed down from the Regional Manager. Kuntsmann Decl. ¶¶ 8, 11, 12. Other Opt-In Store Managers have testified that they performed their jobs in a similar manner. *See* Bashart Depo p. 50; Clifton Depo p. 33; Duncan Depo pp. 48, 52; Torres Depo pp. 66, 73; Stockstill Depo p. 56; Lewis Depo p. 64; Presswood Depo p. 31, 89; Spears Depo pp. 45-46; Munoz Depo p. 68; Wiers Depo p. 46; Griffin Depo p. 95. This is sufficient similarity to defeat decertification, especially in light of the other evidence presented in this case.

Even the individuals Aaron's identifies in footnote 52 as directing work on a

weekly basis only testified that a negligible amount of their time was spent directing employee work.  These ranged from ½ an hour per week to a couple of hours per day. *See* Munoz Depo p. 188; Wier Depo p. 131.  Such testimony is consistent with those who did not direct at all because it shows how little time was actually spent performing this allegedly non-managerial duty during the course of a week.  It amounts to a very small percentage of time, especially when one considers the number of hours General Managers were working on a regular basis.  That all General Managers spent such a negligible amount of time performing this duty, much in the manner of a working foreman, shows how similar they are to each other.

The evidence shows that what little role a General Manager played in directing store employee's work is no different than that of the non-exempt Assistant Manager or a non-exempt "Working Foreman." *Morgan*, 551 F.3d at 1268 & n.55("Similarly, an employee whose primary duty is to perform nonexempt work does not become exempt merely because she has some responsibility for occasionally directing the work of nonexempt employees." ); *see also id.* at 1285 ("At root, [the Working Foreman regulation] is designed to illustrate that an employee who performs the same nonexempt, manual tasks as his co-workers is not an executive even though he is technically a supervisor.");  *id.* at 1285 ("[T]the working or supervising foreman concept still provides a helpful example of how to apply the exemption defense.").

### 9.     Kuntsmann and the Other General Managers Used Little To No Discretion When Closing Leases

Kuntsmann testified that the process of closing leases involved virtually no discretion on his part.   Kuntsmann Depo pp. 113-114.  Some risk "assessment" had to be performed on customers before they could be leased merchandise.  Kuntsmann Depo p. 113.   This assessment consisted of checking out the customer's lease application and making sure that all of the blanks were filled out.  *Id.*  The assessment did not involve any discretion on the part of the General Manager.  Kuntsmann Depo pp. 113-114.  Kuntsmann never turned down a lease agreement because they were always filled out.  Kuntsmann Depo p. 114.  In addition to the General Manager, the CAM and the Sales Manager also closed lease agreements and performed the same "assessment" as the General Manager.  Kuntsmann Depo p. 113.   Other Store Managers testified that they had the same lack of discretion in determining if a person could lease merchandise from Aaron's, in addition other non-exempt individuals also closed leases at stores.  *See* Bashart Depo p. 159; Clifton Depo p. 106; Torres Depo p. 137; Vitale Depo pp. 159, 193-194; Richardson Depo pp. 177-179, 206; S. Williams Depo p. 113-114.

32

10.     **Kuntsmann and Other General Managers Used Very Little Discretion and Performed Similar Duties Regarding Collections**

The evidence shows that Kuntsmann and the other Opt-In Plaintiffs had duties related to the collection of accounts which were over 31 days.  Kuntsmann Depo p. 121; *See e.g.,*  Bashart Depo p. 170; Clifton Depo p. 114; Torres Depo p. 155; Vitale Depo p. 206; Stockstill Depo p. 156; Pettigrew Depo p.123; Lewis Depo p. 175-176; Presswood Depo p. 120; Munoz Depo pp. 70-71; Storm Depo p. 121; .Richardson Depo p. 201. These General Managers duties in regard to these accounts were no more than acting as a collector in the same manner as the non-exempt CSRs and CAMs.  *Id.* The collection of this "bucket" of accounts was a part of all General Manager's job duties and did not vary from store to store.

General Managers were also required to make field visits, which were essentially collection calls made to customers homes.  *See* Kuntsmann Depo p. 151; Bashart Depo p. 200; Duncan Depo p. 190; Vitale Depo p. 238; S. Williams Depo p. 98-99; Clifton Depo p. 135; Torres Depo p. 183.  There was nothing managerial or discretionary about these visits as it was nothing more than an attempt to get money from non-paying customers or pick up merchandise if the customer chose to not pay. *See* Kuntsmann Depo pp. 151-152; Bashart Depo p. 200; Duncan Depo p. 190; Vitale Depo p. 238; Clifton Depo p. 135.  There was nothing about that duty that was non-

33

exempt.

### 11.    Legal Compliance and Safety and Security

Aaron's also argues that employees were dissimilar in terms of how they handled legal compliance and safety and security.  That is not true simply because the Pathways manual exhibit extreme control over both of these areas.  Pathways dictated how paperwork was to be filled out and what policies were to be followed.  *See* pp. 5-16 *supra*.  In addition, Pathways also dictated most, if not all procedures relating to store safety.  *Id.*

The question asked during depositions regarding their responsibility for safety and for ensuring that policies were followed were ambiguous at best.  Those general types of questions could apply to anyone who worked at the store.  All employees are responsible for ensuring some level of safety.  Likewise, all employees are responsible for ensuring that the company's anti-harassment and anti-discrimination policies are followed.  However, without the ability to chose their own staff and to unilaterally terminate employees who were causing problems, in addition to the restrictive provisions of the Pathways manual, all of the General Managers' ability to be ultimately responsible for either of these were severely handicapped.

### 12.    All Employees Were Paid Using The Same Method

All Aaron's General Managers were paid using the same method - the

commission/salary structure that Aaron's attempts to use to obtain decertification under the retail sales commission exception. There is no evidence that any Store Managers were paid based upon a different method.  The fact that Store Managers were paid a different amount does not make them dissimilar.  That fact is irrelevant to this inquiry and should be disregarded in any analysis of similarly situated.[8]

## III.  ARGUMENT

The defendant misleads the Court when it states that "individualized defenses to each of their claims independently make a collective action trial unmanageable." This Court is bound by the Eleventh Circuit's seminal case regarding FLSA collective actions regarding store managers, *Morgan v. Family Dollar*, 551 F.3d 1233 (11th Cir. 2008), *cert denied,*

The Eleventh Circuit has already shot down this theory in *Morgan*, where it held

> As to the second factor, whether there were defenses individual to each Plaintiff, Family Dollar argues the executive exemption defense is always individualized and fact specific, thereby precluding this collective action. As discussed later,  applying the executive exemption is "an inherently fact-based inquiry" that depends on the

---

[8]The fact that 4 or so Plaintiffs might qualify for the highly compensated exemption should not be a bar to continued certification.  If the defendant believes its records validate this defense it should move for a directed verdict based on the payroll records of these 4 individuals. Several individuals were dismissed at the *Morgan* trial because of various issues such as judicial estoppel and statute of limitations.  The application of those defenses to the various plaintiffs, unrelated to the actual FLSA exemptions being claimed, did not act as a bar to certification in *Morgan*.  553 F.3d at 1258, n.34.

> many details of the particular job duties and actual work
> performed by the employee seeking overtime pay. See
> *Rodriguez v. Farm Stores Grocery, Inc., 518 F.3d 1259,
> 1263 (11th Cir. 2008)*. But Family Dollar ignores the
> overwhelming evidence showing that the Plaintiffs, as a
> group, shared a number of factual details with respect to
> their job duties and day-to-day work.  Just because
> the inquiry is fact-intensive does not preclude a collective
> action where plaintiffs share common job traits. Given the
> volume of evidence showing the store managers were similarly
> situated, and the fact that Family Dollar applied the executive
> exemption across-the-board to every store manager--no matter
> the size, region, or sales volume of the store--Family Dollar
> has not shown clear error in the district court's finding
> that its defenses were not so individually tailored to each
> Plaintiff as to make this collective action unwarranted or unmanageable.

*Morgan* at 1263.  The evidence presented by the General Managers at issue in this case is strikingly similar to the evidence presented by the *Morgan* plaintiffs.

Aaron's effort to base decertification on isolated deposition extracts on a few duties taken out of context for a handful of deponents is exactly what the Eleventh Circuit rejected in *Morgan*, 551 F.3d at 1263 n.44, 1277-1278.  The Court held that the whole body of evidence must be examined, not just a set of depositions handpicked by the defendant to the exclusion of all the other evidence in the case, such as the policies, rules and records of the defendant, as well as the testimony of corporate officials which cover a broad swath of the collective, if not its entirety.

> But the jury's verdict as to that defense was not based on the
> testimony of just seven Plaintiffs. Instead, the parties

presented an abundance of trial evidence about the executive exemption issue, including (1) a vast array of corporate manuals; (2) testimony from 39 witnesses including Family Dollar executives, district managers who ran the operations of 134 stores, and store managers who worked at a total of 50 different stores; (3) detailed charts summarizing wages and hours; and (4) a wealth of exhibits including emails, internal Family Dollar correspondence, payroll budgets, and in-store schematics. If one factors in that Broome and Barkus oversaw thousands of stores, the witnesses go from representing hundreds of stores to thousands. In addition to the large quantity of testimonial evidence, the non-testimonial evidence was equally high in quality and largely comprised of Family Dollar's corporate records. The jury's verdict is well-supported not simply by "representative testimony," but rather by a volume of good old-fashioned direct evidence.

*Morgan*, 551 F.3d at 1277.[9] As shown throughout this opposition, Aaron's makes this same mistake by ignoring its own company-wide policies and the testimony of its own corporate officials which show a common set of Store Manager duties and a single, across-the-board decision that applies to all Store Managers alike.

### A.    The Use of Individual Exemption Defenses Does Not Bar Litigating This Case As A Collective

---

[9] The Court also found it "revealing" that Family Dollar tried to limit the testimony to a few plaintiffs and not present much testimony from its own officials or evidence from its own policies, training manuals, e-mails and other records. *Morgan*, 551 F.3d at 1277-1278 ("Family Dollar cannot validly complain about the number of testifying plaintiffs when it successfully objected to Plaintiffs' attempt to present the testimony of almost 20 times as many Plaintiff store managers. Although Family Dollar itself had the opportunity to present a great deal more testimony from Plaintiff store managers, or its own district managers, it chose not to. Indeed, Family Dollar used only 10 of its allotted 40 hours for its defense, even though it bore the burden of proving the executive exemption defense.").

In this case, Aaron's is claiming the same exemption defenses for Kuntsmann and all virtually all of the Opt-in Plaintiffs - the executive, the administrative, the combination, and the retail commission exception.[10] Defendant's 30(b)(6) representative testified that the company was claiming the executive and administrative exemption for every manager. Lawrence Depo pp. 18-19. Therefore, these defenses are common to the class. It is not as if Aaron's is claiming the executive exemption for Kuntsmann, the administrative for Bashart, and the combination for Torres. They are claiming the same exact exemptions for all of the General Managers regardless of the size, region or sales volume of the store.[11] *See Morgan* at 1263. The decision to classify General Managers as exempt was also made at one time and applied regardless of size region or sale volume of the store. In other words, Aaron's did not make any kind of individual determination through examining

---

[10]Aaron's is apparently claiming the highly compensated exemption for 4 of the 200+ Opt-Ins. The fact that such a statistically insignficant number of Plaintiffs may be subject to this defense should not require decertification for the remaining 200+ Plaintiffs.

[11]During his deposition, Chad Strickland, Aaron's Vice-President of Employee Relations, testified that at the time the company had the GM's complete the declarations in February, 2009 **Aaron's did not know whether the GM was properly classified or not.** Strickland 73:17 -75:12. How a company could classify a position for years as an exempt position and not even know if the position met the requirements to qualify for whatever exemption it claimed is most telling and goes directly to the issue of willfulness.

the job duties manager by manager to determine whether or not the individuals in this job classification truly were exempt under the FLSA.  The company simply said these people are General Managers and we are making them exempt.  Just like in *Morgan*, such a decision is perfect for adjudication through a collective action.

Furthermore, as previously argued these General Managers are substantially similar in the job duties relevant to all exemptions. The executive, administrative and combination exemptions all require an analysis of whether or not the plaintiffs' job duties qualified them for the exemption.  What Aaron's cannot and actually does not dispute is that all of these General Managers worked under the same job description, were subject to the same controlling Pathway Operating Manual, underwent the same in-store and online training, attended the same regional profit and loss meetings and occasional nationwide sales meetings, and were paid in the same manner under the exact same pay policies.  *See Defendant's Response In Opposition To Plaintiffs' Motion To Renew Motion To Facilitate Notice* (Doc. 42 p. 28).  Aaron's has admitted to all of this through prior filings with the Court.  *Id.*  They cannot now come back and recant because it makes a better argument in support of certification.

The Court now has to view the testimony of Kuntsmann ***and the Opt-In Plaintiffs*** in light of the above similarities to determine if these individuals are

similarly situated.[12]  As shown above, these General Managers all performed the same duties and had the same responsibilities, day in and day out.   The company's overreaching and micro-managing policies and Regional Managers made sure of that. The evidence presented by the plaintiffs paints an overwhelming picture that by and large these General Managers who filed and/or opted into this case are similarly situated.

To establish an employee is a bona fide executive, an employer must show: (1) the employee is "[c]ompensated on a salary basis at a rate of not less than $ 455 per week"; (2) the employee's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof"; (3) the employee "customarily and regularly directs the work of two or more other employees"; and (4) the employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." *29 C.F.R. § 541.100(a) (2006).*

---

[12]Aaron's has presented evidence from non-plaintiff witnesses as to the alleged actual job duties of the General Managers.  This evidence should be disregarded, at least at this stage, because what other duties non-plaintiff employees performed are not relevant to the inquiry as to whether Kuntsmann and the Opt-In Plaintiffs are similarly situated.  If the non-plaintiff employees had felt they were similarly situated to Kuntsmann and the others, they would have joined the case.  The fact that they have not joined renders their testimony on the issue of similarly situated irrelevant.

General Managers could not hire and could not fire employees at the stores where they worked.  There is no evidence that any particular weight was given to any of the recommendations that General Managers made on these issues.  General Managers by and large could not issue disciplines to employees, especially without Regional Manager approval.  The General Managers did not have discretion to schedule employees as they saw fit for the stores they were allegedly managing.[13] Aaron's General Managers did not evaluate store employees and provided minimal direction, if any, as to daily tasks.  General Managers did not set the pay of any of the store's employees.

In regard to the administrative exemption, the requirements are: (1) performing office or non-manual work directly related to the management or general business operation of the employer, and (2) must have a primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance.

The evidence shows that virtually all of the Aaron's General Managers who testified used very little discretion or independent judgment regarding matters of importance for the company.  They did not set sales goals and did not evaluate

---

[13]The fact that some Plaintiffs testified that the company provided schedules and some testified that the Regional Manager had to either fill out or approve the schedule does not bar a finding of similarity.  What is important for purposes of this analysis is that either way you looked at it the General Manager did not have control over that activity.

employees. Collections were handled in a consistent manner throughout the company according to the policies and procedures that applied to all stores.

Finally, and most importantly, in regards to the job duty which took up a lot of their time - closing lease agreements- offered no avenue for the use of discretion or independent judgment. The customer either filled out the entire application or did not. If they did, then they could lease from Aaron's. If they did not, then they were not given a lease. It was as simple as that. Any variations from this basic rule had to be approved through the use of independent judgment and discretion of the **Regional Manager**, not the General Manager. This duty was handled in the same manner throughout the country, at all stores regardless of size or sales.

The analysis must be the same regarding the combination exemption. Since it is just a review of the same elements making up both the executive and primary duty exemptions, the same evidence must be viewed and a determination made based on that evidence. Based on *Morgan*, that review can be performed on a collective basis.

A cursory reading of Aaron's brief would lead the reader to believe that it is necessary to litigate each individual General Manager's case because some may qualify for the executive exemption, some might qualify for the administrative exemption and some might qualify for the combination exemption. Such a rudimentary reading is belied by the evidence in this case that Aaron's has never done

an independent store by store study to determine (1) if each and every individual General Manager is properly classified as exempt; and (2) if properly classified, then which of the three exemptions do they fall under.   Aaron's has simply made the decision that all of its General Managers are exempt without conducting an individual analysis of what each and every Manager does on a daily basis.  According to *Morgan*, the correctness of such a decision is susceptible to review on a collective basis.  *See Morgan* at 1263 ("the bulk of evidence demonstrated that the store managers were similarly situated and even Family Dollar perceived no such distinction. Indeed, it exempted all store managers from overtime pay requirements without regard to store size, sales volume, region, district, or hiring and firing authority.").  This is especially true in a situation where the plaintiffs perform the same tasks under the same job descriptions in virtually identical stores selling virtually the same merchandise.  As *Morgan* further instructs

> There is nothing unfair about litigating a single corporate decision in a single collective action, especially where there is robust evidence that store managers perform uniform, cookie-cutter tasks mandated by a one-size-fits-all corporate manual.

551 F.3d at 1264.

In addition, the Eleventh Circuit held that it is proper to maintain a collective action where the evidence shows that Plaintiffs shared "a number of factual details

43

with respect to job duties and day-to-day work."  551 F.3d at 1263.  Furthermore, the

*Morgan* court addressed the individualized defense argument as follows

> Just because the inquiry is fact-intensive does
> not preclude a collective action where plaintiffs
> share common job traits. Given the volume of
> evidence showing the store managers were similarly
> situated, and the fact that Family Dollar applied the
> executive exemption across-the-board to every store
> manager--no matter the size, region, or sales volume
> of the store--Family Dollar has not shown clear error
> in the district court's  [**74] finding that its defenses
> were not so individually tailored to each Plaintiff as
> to make this collective action unwarranted or unmanageable.

551 F.3d at 1263.  That very same evidence exists in this case.

The Court should note that Aaron's claim of any exemption for these General

Managers should be viewed with much scepticism.   From the outset of this litigation

the company has steadfastly refused to choose which exemption it was claiming for

these managers.  That is because to date, based upon a comparison of the testimony

of its witnesses and the pleadings filed in Court, Aaron's does not know which

exemption or exception it is applying to these plaintiffs.  It appears that Aaron's

approach is to throw a bunch of mud on the figurative wall of this Court and see if

anything sticks.  It is almost a "hey, we cannot try this thing collectively because we

may decide to utilize every defense known to man, whether they have any relevance

to the case" approach.  Such gamesmanship should not be rewarded.

This Court should instead follow binding Eleventh Circuit precedent in *Morgan* and deny the decertification motion before it.  Aaron's has not presented any relevant theory or defense which was not addressed in *Morgan*.  The Eleventh Circuit has clearly stated that these retail store manager exemption cases can be tried collectively where all plaintiffs were all classified as exempt by the company in one, single decision and worked under the same job description, under the same controlling policies and procedures, under the same corporate dictated micro-managing Regional Managers, and performing essentially the same cookie-cutter tasks all across the country.  All of those factors exist in the present case and are a sufficient basis for the Court to deny the motion for decertification.

### B.    The Attempted Use of the Retail Sales Commission Exception Should Not Bar Collective Treatment

Aaron's argues that even if the Court determines that the General Manager Opt-in Plaintiffs are similarly situated in regards to the exemption defense, collective treatment would still be inappropriate because it is now claiming that the overtime exception for certain retail sales and service establishment employees found in 29 U.S.C. § 207(i)applies in this case.  Aaron's argument fails for many reasons.

First, and foremost, this argument fails because the §207(i) exception is an affirmative defense.  As such, it must be pled with some specificity in the defendant's

Answer.  Aaron's wholly failed to raise the retail sales commission defense in its Answer and Amended Answer.  In fact, Aaron's went so far as to plead in both its Answer and Amended Answer that **"Aaron admits that plaintiff and ALL similarly situated General Managers are *paid a specified weekly salary."*** Doc. 5 p. 5 ¶11 & Doc. 114, Ex. 1 p. 6 ¶11. (emphasis added).  Aaron's should not be allowed to come in at this late date and now assert that it paid its General Managers a commission and that it properly denied them overtime because of the retail sales commission defense.

Secondly, Aaron's cannot prevail on this defense because its payment plan does not qualify under the regulations.  The Section 7(i) defense only applies where an employee (i) works in a retail or service establishment; (ii) earns, on a weekly basis, a regular rate of at least one and one-half times the federal minimum wage; and (iii) earns more than one-half of his or her compensation for a representative period as commissions on the sale of goods and services. 29 U.S.C. §207(I).   Aaron's General Managers were not paid commissions on the sale of good as is defined in the regulations.  Instead, they received the same amount of pay for each week they were employed.  As described in the response to Kuntsmann's summary judgment motion, while the rate was based on a review of the store's profit and loss sheets in June and December.  General Manager pay was then adjusted at that time based on the store's results.  As a result the General Manager's were paid essentially the same amount for

46

that 6 month period.  Such a payment plan does not qualify as a bona fide commission. *See Lee v. Ethan Allen Retail, Inc.,* 651 F.Supp.2d 1361, 1366 (N.D.Ga. 2009)("A commission rate is not bona fide where "the employee, in fact, always or almost always earns the same fixed amount of compensation for each workweek.")(quoting 29 C.F.R. § 779.416(c)).  As such, the retail sales exception does not even apply in this case and cannot be a bar to proceeding as a collective.

Finally, even if the Court should determine that Aaron's be allowed to pursue the 207(i) defense, that still is not a bar to proceeding as a collective action.  If allowed, Aaron's is apparently claiming this defense for all General Managers.  The same pay system applies to all General Managers.  The defense will be proven by a review of payroll records using the same analysis for each employee.  There is nothing about that which prohibits maintaining the collective action in this case.

## C.    The Use of The Highly Compensated Exemption Does Not Bar Collective Action Status

As argued above, the fact that 4 of the 200+ Opt-In Plaintiffs may be exempt under the highly compensated exemption does not serve as a bar to collective action status.  If the Court wishes to take up that issue separately it can entertain rule on that issue solely based on Aaron's payroll records at the appropriate time.  However, the mere existence of this defense to such a small group of Plaintiffs does not bar

47

collective litigation.

### D.   The Fact That Certain Signed Jury Waivers Also Should Not Bar Collective Status

Aaron's argues that the existence of jury trial waivers signed by 159 of the 200+ Opt-In Plaintiffs makes this action unsuitable for collective action status.  This argument is not valid.  If this were truly a concern and Aaron's was really going to assert this defense, the issue could have been raised before now.  It has not.  Aaron's did not raise this issue at the initial certification stage.  Once the case was initially certified, Aaron's could have already filed a motion to strike the right to jury trial of these individuals.  It has not.  Instead, it has allowed the case to progress through discovery and now relies on a vague, non-committal assertion of the jury trial waiver to attempt to gain decertification. Such gamesmanship should not be rewarded and Aaron's should be barred from now asserting this defense.

However, even if the Aaron's is still allowed to assert this defense at this stage of the litigation, it is still not a bar to continued certification.  This issue is collateral to the determination of whether or not these individuals are properly classified as exempt under the FLSA.  If the Court so chooses, it can rule on this issue for the affected Plaintiffs, if and when the defendant actually raises the issue.  Until then there is nothing ripe for adjudication.

48

Furthermore, Aaron's apparently knows which individuals have signed these waivers and presumably Aaron's has copies of all of the waivers.  All versions of these waivers are found in their evidentiary submission attached to the Declaration of Jessica Lawrence.  Based upon the cases cited by Aaron's, the facts needed to determine if the right to a jury trial has been waived can be adjudicated if the case remains certified as a collective action on a collective basis.  It appears from the defendant's submission that each Plaintiff was forced to sign the waiver as a condition of continued or future employment and that the waiver was contained on a pre-printed form prepared by the company.  According to the case law, that should be sufficient to determine whether or not these individuals waived their rights.  As such, this collateral issue does not require decertification.[14]

### E.    The Potential Application of Judicial Estoppel to Plaintiffs Who Filed Bankruptcy Should Not Prevent Collective Treatment

If the defendant believes its records validate this defense it should move for a directed verdict based on the payroll records of these 4 individuals.  Several individuals were dismissed at the *Morgan* trial because of various issues such as judicial estoppel and statute of limitations.  The application of those defenses to the

---

[14]If the defendant were to actually raise the issue as to specific Plaintiffs and the Court to determine that these Plaintiffs had waived their right to a jury trial, it still would not bar the case from proceeding as a collective action.  The Court could order the Plaintiffs divided into subclasses with one group subject to trial by jury, while the other subject to a ruling from the Court.  Judicial economy would still be served and the defendant would suffer no prejudice.

various plaintiffs, unrelated to the actual FLSA exemptions being claimed, did not act as a bar to certification in *Morgan*. 553 F.3d at 1258, n.34.

### F.  *Wal-Mart v. Dukes* Has No Bearing Here

Courts have already begun to hold that the recent decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011), does not apply to FLSA and other cases that are not subject to Rule 23 and do not involve the type of supervisor-by-supervisor subjective opinions that were at issue in that case.  *Ugas v. H&R Block Enterprises, LLC*, 2011 U.S. LEXIS 86769 (2011)("Unlike in *Wal-Mart*, here plaintiffs have shown that there was 'a common mode of exercising discretion that pervades the entire company."); *Mitchell v. Smithfield Packing Company, Inc.*, 2011 U.S. LEXIS 108974 (2011)("In *Dukes*, there was no single decision, policy or plan at issue, and the defendants' liability to the individual class members depended on unique and subjective circumstances.  In contrast, this case involves a uniform policy or practice of compensating employees based on their scheduled shifts."); *Martinez-Hernandez v. Butterball, LLC*, 2011 U.S. LEXIS 112045 (2011); *Troy v. Kehe Food Distributors, Inc.*, 2011 U.S. LEXIS 110012 (2011); *Nehmelman v. Penn National Gaming, Inc.*, 2011 U.S. LEXIS 111485 (2011).

It is well-known that "[t]he requirements for pursuing a §216(b) class action are independent of, and unrelated, the requirements for class action under Rule 23 of the

Federal Rules of Civil Procedure." *Grayson,* 79 F.3d 1086, 1096 n. 12 (11th Cir. 1996)(citing *LaChapelle v. Owens Illinois, Inc.,* 513 F.2d 286, 289 (5th Cir. 1975)). The *Wal-Mart* decision does not address the type of factual determinations required in an FLSA case, much less undermine such findings. *Wal-Mart* involved no single-plant compensation policy and challenged only individual discretion exercised by supervisors making subjective promotion and pay decisions.

The court in *Bouaphakeo* has recently held that *Wal-Mart* does not apply to the type of line-time or scheduled-time compensation system at issue in this case.

> Unlike *Dukes*, there is a common answer available to this question because, unlike *Dukes*, the instant case involves a company wide compensation policy that is applied uniformly throughout defendant's entire Storm Lake facility. **If it is determined that the [contested activities] constitutes "work" for which plaintiffs are entitled to compensation, then such a determination is applicable to all such situated plaintiffs.** The instant matter is not like *Dukes* where each alleged Title VII violation involved an inquiry into the individual decisionmaker's subjective thought process. Moreover, the court does not see the same evidentiary defects in the instant case as those addressed in *Dukes*, as the instant case is supportable by class-wide proof.

*Bouaphakeo, et al. v. Tyson Foods, Inc.,* 2011 U.S. Dist. LEXIS 95814, *5 (N.D. Iowa, Aug. 25, 2011) (emphasis added); *see also Ramos v. Simplex Grinnell LP*, 2011 U.S. Dist. LEXIS 65593, **15-16 (S.D. N.Y. 2011); *Eddings v. Health Net, Inc.,* No. CV-10-1744-JST (C.D. Cal. July 27, 2011) (emphasis added).

### G.    Fairness and Procedural Concerns Actual Dictate Trying This Case As A Collective

*Morgan* held that "[t]here is nothing unfair about litigating a single corporate decision in a single collective action, especially where there is robust evidence that store managers perform uniform, cookie-cutter tasks mandated by a one-size-fits-all corporate manual." *Morgan,* 551 F.3d at 1264.[15]  The same type of corporate manuals have regimented General Managers' duties at Aaron's.  *See* pp. 5-16 *supra.*

Even if such a one-size-fits-all manual had not been adopted by the current retail chain, the Eleventh Circuit's decision in *Morgan* cautioned that defendant's fairness/due process argument "butts up against the purpose of a collective action — to efficiently resolve a large number of plaintiffs' claims." *Morgan*, 551 F.3d at 1264. "Addressing whether Plaintiffs' claims could be tried fairly as a collective action also requires looking to the purposes of § 216(b) actions under the FLSA: (1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct." *Id.*  Because of this, "the size of an FLSA collective action does not, on its own, compel the

---

[15]"Cookie-cutter tasks mandated by a one-size-fits-all corporate manual" were the actual words used in  *Morgan*, and it is clear that the same type of manual exists here, as shown at pages 27-33 *infra*. The Court also held that "[t]here is nothing inherently unfair about collectively litigating an affirmative executive-exemption defense where the district court has made well-supported and detailed findings with respect to similarity. Indeed, the more similar the employees, the less likely that collectively litigating the executive-exemption issue can be fundamentally unfair.  *Id.* at 1264.

conclusion that a decision to collectively litigate a case is inherently unfair." *Id.* at 1264.

## CONCLUSION

Based on the above, the Court should deny the defendant's Motion for Decertification. Aaron's has shown no evidence, nor made no argument that shows that this case is in any way distinguishable from *Morgan v. Family Dollar.* As such, the Court's prior ruling certifying this case as a collective action should be allowed to stand and the parties should be allowed to try this matter collectively in one trial.

Respectfully submitted,

/s/Kevin W. Jent_____
Gregory O. Wiggins
Kevin W. Jent

*Counsel for the Plaintiffs*

OF COUNSEL:

WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
205/314-0500

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have filed today, December 22, 2011, by CM/ECF, the Court's e-filing system, which will serve a copy of the foregoing to the following:

Brett C. Bartlett
Robert C. Stevens
SEYFARTH SHAW LLP
1075 Peachtree Street NE
Suite 2500
Atlanta, GA 30309-3962

Stanford G. Wilson
Alisa P. Cleek
Douglas H. Duerr
ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, NE
Atlanta, GA 30303

Albert L. Vreeland, II
LEHR, MIDDLEBROOKS & VREELAND, P.C.
2021 Third Avenue North
Post Office Box 11945
Birmingham, AL 35202-1945

/s/Kevin W. Jent
OF COUNSEL
