FILED
2012 Oct-04  AM 11:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TOM KUNTSMANN, on behalf of himself** | ) | |
| **and all others similarly situated,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.: 2:08-CV01969-KOB** |
| | ) | |
| **AARON RENTS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This FLSA collective action comes before the court on Defendant Aaron Rents' Motion for Summary Judgment as to Plaintiff Tom Kuntsmann individually, filed September 29, 2011. (Doc. 218).[1] Kuntsmann filed a complaint on October 22, 2008, alleging that Aaron willfully violated the Fair Labor Standards Act ("FLSA") by misclassifying him and similarly situated employees as exempt from the FLSA's overtime requirements. (Doc. 1). Mr. Kuntsmann sought to represent a collective class of "opt-in" plaintiffs. Aaron asserts that it is entitled to Summary Judgment because the undisputed facts and applicable law establish that Aaron properly classified Kuntsmann as exempt from the FLSA's overtime provisions and compensated him in accordance with 29 U.S.C. § 207(i), which precludes Kuntsmann from proving Aaron violated the FLSA. Because genuine issues of material fact exist and because Aaron is not entitled to judgment as a matter of law, the court finds that Aaron's Motion for Summary Judgment is due to be DENIED.

---

[1]     After prolonged mediation efforts, this case was transferred to the undersigned judge on June 26, 2012.

I.      STATEMENT OF FACTS AND PROCEDURAL HISTORY

        A.      Factual History

        Aaron sells and leases residential furniture, consumer electronics, home appliances, and

accessories for personal, family, and household purposes. Aaron hired Kuntsmann as a Regional

Sales Manager in July 2005. He held that position until he was demoted to the General Manager

("GM") position at the Anniston, Alabama store on November 1, 2007. Kuntsmann worked as

GM at the Anniston store for five months, until April 2008, when Aaron terminated him for

violating company policy.  Kuntsmann reported to Regional Manager ("RM") Paula Hooks

throughout his tenure as GM of the Anniston store.

        The parties hotly dispute Kuntsmann's role and duties as GM of the Anniston store.

Kuntsmann claims that his primary duties were non-managerial, such as unloading trucks,

moving merchandise, cleaning the store, waiting on customers, and calling on customers to make

collections. Kuntmsann also claims that he had little involvement in the supervision of his fellow

employees; he claims that he did not train them, motivate them, set their goals, evaluate their job

performance, allow them to work overtime, or set their work schedules. Kuntsmann alleges that

the Regional Manager or "someone higher up in the Corporate chain of command" had control

over managerial tasks in the store, such as hiring procedures, employee scheduling, and lease and

collection procedures. (Doc. 221-24, at 3).

         Aaron claims that Kuntsmann was solely responsible for managing the store, overseeing

his subordinate employees, maximizing the store's revenue and profitability, and determining

and implementing business plans. Aaron claims Kuntsmann's duties included supervising store

employees, reviewing their productivity, evaluating their performance, training them, reviewing

their applications for employment, disciplining them, preparing their work schedules, and ensuring their safety and security.  Additionally, Aaron claims that Kuntsmann was heavily involved with customers in negotiating lease agreements, addressing customer complaints, and overseeing collections of overdue lease payments.  The deposition testimony and affidavits submitted by the parties support both of the parties' divergent characterizations of Kuntsmann's duties as a GM. Varying opinions, viewpoints, and recollections emerged in the many depositions and sworn statements taken in this case. Viewing all of the evidence in the light most favorable to the nommovant reveals that some of Kuntmann's duties were supervisory in nature, but he spent much of his time as GM engaged in non-managerial tasks, such as manual labor and customer relations.

During his time as GM of that store, Kuntsmann was the highest ranking and only employee in the store whom Aaron classified as exempt from the FLSA's minimum wage and overtime requirements. Aaron's compensation scheme for GMs is based on the revenue and operating profits of each individual store. The GM of each store receives a monthly income that approximates the expected financial performance of the store in a month. This approximation, called the "draw," is compared with the actual earnings of the store on a monthly basis. Then, Aaron adjusts salary upwards when the store performance exceeds the draw and sometimes downward when the store performance does not meet the draw. GMs are also eligible for monthly bonuses based on set financial goals.  Aaron reviews each store's performance twice a year and can increase or decrease the draw according to performance. Aaron also looks at the financial performance of the store at the end of each quarter and provides the GM a bonus if his total monthly commission is greater than the GM's quarterly draw.

3

B.    Procedural History

Kuntsmann filed a Collective Action Complaint against Aaron on October 10, 2008 for

equitable and injunctive relief and to remedy alleged violations of the wage provisions of the

FLSA. Specifically, Kuntsmann and similarly situated "opt in" employees seek to recover unpaid

overtime compensation, allegedly owed to them under the FLSA, 29 U.S.C. § 201 *et seq*.

Kuntsmann asserts that he and other similarly situated GMs were paid a specified weekly salary,

but were not paid any overtime wages despite the fact that they worked in excess of 40 hours a

week.  The basis of Aaron's Motion for Summary Judgment is that Kuntsmann, as a GM, is

exempt from the overtime requirement under the executive, administrative, or combination

exception under 29 U.S.C. § 213(a)(1) or, in the alternative, that Kuntsmann is still not entitled

to overtime compensation because his actual compensation satisfied the requirements of 29

U.S.C. § 207(i), which applies to commissioned employees working in a retail or service

establishment.

II.    STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases when no genuine issues of

material fact are present and the moving party is entitled to judgment as a matter of law.  *See*

Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment, it must

determine two things: (1) whether any genuine issues of material fact exist; *and if not*, (2)

whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

4

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties about facts is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)   In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added). .

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party.  *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir.

1988).  The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S.

at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.*

*State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed

in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The nonmoving

party "need not be given the benefit of every inference but only of every reasonable inference."

*Id.*  The evidence of the non-moving party "is to be believed and all justifiable inferences are to

be drawn in [its] favor."  *Anderson*, 477 U.S. at 255.  After both parties have addressed the

motion for summary judgment, the court must grant the motion *if* no genuine issues of material

fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

## III.   ANALYSIS

The FLSA generally requires that employers pay their employees time and a half for any

time an employee works in excess of 40 hours a week. 29 U.S.C. § 207(a)(1); *Alvarez Perez v.*

*Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1156 (11th Cir. 2008). However, these

overtime provisions do not apply to all employees; the FLSA exempts from its minimum wage

and overtime requirements "any employee employed in a bona fide executive, administrative, or

professional capacity." 29 U.S.C. § 213(a)(1). Aaron argues that it properly classified Kuntsmann

as exempt from the FLSA's overtime provisions pursuant to the executive exemption,

administrative exemption, and the combination exemption. Alternatively, Aaron asserts that if it

did misclassify Kuntsmann, he is still not entitled to overtime compensation because his actual

compensation satisfied the requirements of 29 U.S.C. § 207(i), which applies to commissioned

6

employees working in a retail or service establishment.

A.   The Executive Exemption

Aaron first argues that it properly classified Kuntsmann as exempt as an executive. The executive exemption provides that the FLSA's overtime requirements "shall not apply with respect to . . . any employee employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1). Under the Department of Labor ("DOL") regulations, to establish an employee as a bona fide executive, an employer must show: (1) the employee is "[c]ompensated on a salary basis at a rate of not less than $455 per week;" (2) the employee's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;" (3) the employee "customarily and regularly directs the work of two or more other employees;" and (4) the employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a) (2006);  *Morgan v. Family Dollar Stores, Inc.*, 551 F. 3d 1233, 1266 (11th Cir. 2008).

The parties agree that the first element – the amount of salary – is met.  While Kuntsmann was employed as GM of the Anniston store, his monthly draw was $4,583 ($55,000 annually) and was never reduced. This amount equates to approximately $1,057.69 per week, easily satisfying the salary requirement for the executive exemption. The parties hotly dispute, however, the remaining three elements.

The regulations state that "[t]he term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a) (2006). The regulations explain that the primary duty analysis "must be based on all the facts in a particular

7

case," but "with the major emphasis on the character of the employee's job as a whole." *Id*.

Furthermore, the regulations list five factors to be considered when conducting the primary duty

inquiry: (1) "the relative importance of the exempt duties as compared with other types of

duties;" (2) "the amount of time spent performing exempt work;" (3) "the employee's relative

freedom from direct supervision;" and (4) "the relationship between the employee's salary and

the wages paid to other employees for the kind of work performed by the employee." *Id.; see*

*also Family Dollar,* 551 F. 3d at 1268.

A particular point of contention in this case is the factor addressing the "amount of time

spent performing exempt work."  The Eleventh Circuit presented the following analysis of this

factor in *Family Dollar*:

> The new regulations state that this factor "can be a useful guide in determining
> whether exempt work is the primary duty of an employee" and that "employees
> who spend more than 50 percent of their time performing exempt work generally
> will satisfy the primary duty requirement." 29 C.F.R. § 541.700(b) (2006). As in
> the old ones, the new regulations specify that "[t]ime alone, however, is not the
> sole test" and thus "[e]mployees who do not spend more than 50 percent of their
> time performing exempt duties may nonetheless meet the primary duty
> requirement if the other factors support such a conclusion." *Id*. (2006).
>
> The new regulations also clarify that "[c]oncurrent performance of exempt
> and nonexempt work does not disqualify an employee from the executive
> exemption if the requirements of § 541.100 are otherwise met." *Id*. § 541.106(a)
> (2006). In other words, an employee's performance of nonexempt work does not
> preclude the exemption if the employee's primary duty remains management.
> Similarly, an employee whose primary duty is to perform nonexempt work does
> not become exempt  merely because she has some responsibility for occasionally
> directing the work of nonexempt employees. "Whether an employee meets the
> requirements of § 541.100 when the employee performs concurrent duties is
> determined on a case-by-case basis" and based on the factors already set forth in §
> 541.700(a) as to the primary duty question. *Id*. (2006).

551 F.3d at 1268-69 (footnote omitted).

8

An exempt executive employee must perform management duties, and those duties must be his primary duty. The regulations provide a list of examples of management duties:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the type of materials, supplies, machinery, equipment or tools to be used for merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

Aaron asserts that Kuntsmann's primary duty was management, as he regularly performed many of the exemplary management duties provided in the regulations, including interviewing applicants and being responsible for the supervision, training, discipline, safety, and security of the store employees. He was also responsible for the store's sales, inventory, and selection and ordering of merchandise. Aaron argues that these management duties were substantially more important to the company that any other types of duties he performed. Finally, Aaron states that Kuntsmann spent sufficient time performing management duties because he performed them simultaneously with nonexempt tasks.

Kuntsmann, however, asserts that he spent 80-90% of his time on non-management tasks, including manual labor involved with unloading freight, cleaning the floors and bathrooms, and replacing merchandise on the sales floor. He claims that in actuality, he performed very few true managerial duties.

The parties also dispute the facts involved in evaluating the remaining two elements

9

under the Executive Exemption – directing the work of other employees and the authority to hire and fire employees. On one hand, Aaron argues that Kuntsmann regularly supervised the work of other employees, and also states that he had the authority to hire employees. On the other hand, Kuntsmann argues that while he assisted other employees in setting their goals, he did not create goals for them, and he denies that he evaluated other employees' performance. Furthermore, Kuntsmann states that while he interviewed employees and could and did make recommendations to the RM, he did not have the authority to hire and fire employees.  Because genuine, and hotly contested, issues of material fact exist as to the extent of Kuntsmann's managerial duties, when viewing the evidence in the light most favorable to the nonmovant, the court cannot grant summary judgment for Aaron under the Executive Exemption.

B.    The Administrative Exemption

Aaron also claims Kuntsmann is not entitled to overtime pursuant to the administrative exemption. An exempt administrative employee is one

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week...

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment to matters of significance.

29 C.F.R. § 541.200. Furthermore, "[t]he phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from . . . selling a product in a retail or

10

service establishment." 29 C.F.R. § 541.201(a). Such work includes, but is not limited to, quality control, purchasing, procurement, safety and health, personnel management, labor relations, public relations, and similar activities. *Id*. 541.201(b). "Some of these activities may be performed by employees who also would qualify for another exemption." *Id*.

Again, the parties strongly contest the existence of the second and third elements. As the court previously stated, the parties dispute the amount of time Kuntsmann spent performing managerial versus non-managerial duties. In addition, Aaron asserts that GMs exercised a great level of independent authority and discretion over the day-to-day operations of the store as the highest ranking employee in the store. Kuntsmann, however, argues that he enjoyed little discretion because nearly all of his decisions, no matter how significant or trivial, were determined by the very detailed company manual or by the Regional Manager.

Because genuine, and hotly contested, issues of material fact exist as to the extent of Kuntsmann's independent judgment and discretion as a GM when viewing the evidence in the light most favorable to the nonmovant, the court cannot grant summary judgment for Aaron under the Administrative Exemption.

C.      Combination Exemption

Aaron also argues that Kuntsmann's duties then qualify him as exempt under the combination exception. An employee who meets some, but not all, of the elements of the executive and administrative exemptions still may qualify as exempt under the DOL's regulations. The combination exemption "focuses solely on the employee's job duties." *Intracomm, Inc. v. BAE Systems, Info Tech, LLC*, 492 F. 3d 285, 293 (4th Cir. 2007) (citing 29 C.F.R. § 541.708). The regulations provide:

11

> Employees who perform a combination of exempt duties as set forth in the regulations in this part for executive, administrative, professional, outside sales and computer employees may qualify for exemption. Thus, for example, an employee whose primary duty involves a combination of exempt administrative and executive work may qualify for an exemption. In other words, work that is exempt under one section of this part will not defeat the exemption under any other section.

29 C.F.R. § 541.708. The combination exemption "provides a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test." *Intracomm, Inc.*, 492 F. 3d at 294.

Whether Kuntsmann's duties were managerial or administrative in nature or something else entirely bears directly on the issue of whether he qualifies as exempt under the Combination Exception. Again, the parties dispute the nature and importance of the duties performed by Kuntsmann, including the amount of time he spent performing managerial versus non-managerial duties, precluding summary judgment under the Combination Exception.

Simply stated, genuine issues of material fact exist regarding the application of the Executive, Administrative, and Combination Exceptions to Kuntsmann's job duties as a GM at Aaron.   Considering the facts in favor of Kuntsmann as the non-movant, Aaron cannot  meet its initial burden on summary judgment. *See Celotex Corp.,* 477 U.S. at 323 (the moving party bears the initial burden of proving the absence of a genuine issue of material fact).

D.      29 U.S.C. § 207(i)- Retail or Service Establishment Exemption

In the alternative, Aaron argues that if it did misclassify Kuntsmann as exempt, then the undisputed facts establish that it nevertheless paid him in accordance with the § 207(i) exception; the exemption relieves Aaron from the overtime pay requirements of the FLSA if Kuntsmann's regular rate of pay exceeded one and one-half of the required minimum wage and more than one-

half of his compensation was earned under a bona fide commission plan.  To establish the applicability of the § 207(i) exception, Aaron must show that (1) the Anniston store is a "retail or service establishment;" (2) the Plaintiff's regular rate of pay exceeds 1.5 times the minimum wage; and (3) more than half of the Plaintiff's compensation for a representative period (not less than one month) represents commissions on goods or services. 29 U.S.C. 207 § (i); *Klinedinst v. Swift Investments, Inc.*, 260 F. 3d 1251, 1254 (11th Cir. 2001).

1.   29 U.S.C. § 207(i) as a Waivable Affirmative Defense

First, however, the court will address Kuntsmann's procedural arguments against Aaron's invocation of § 207(i). Kuntsmann argues that Aaron has waived this particular defense because it is an affirmative defense, and Aaron did not specifically plead it in its initial Answer or in its Amended Answer. In support, Kuntsmann points to the definition of "affirmative defense": "[a]n affirmative defense is any fact asserted by the respondent that vitiates the opposing party's claim . . . A party must raise all affirmative defenses as affirmative defenses or they are waived." STEVEN BAICKER-MCKEE, JOHN B. CORR, AND WILLIAM M. JANSSEN, FEDERAL CIVIL RULES HANDBOOK, 350 (2011).  Kuntsmann asserts that defense counsel affirmatively disavowed invoking § 207(i) earlier in the litigation, and Aaron did not raise it until after discovery had been closed and it had obtained new counsel.

In response, Aaron argues that § 207(i) is not an affirmative defense that can be waived, but is instead a manner in which employers can comply with the FLSA's pay requirements. The parties do not indicate, and this court is not aware, of any precedent from the Eleventh Circuit regarding whether § 207(i) is an affirmative defense. However, Aaron does direct the court to a relevant decision from the Seventh Circuit that held that, "[s]ection 7(i) is not an affirmative

13

defense that should have been raised in the pleadings. It is a method of complying with the [FLSA], part of § 7 that states the Act's general rules, and the general denial of liability therefore put this (and all other methods of compliance) in play." *Walton v. United Consumers Club*, 786 F.2d 303, 307 (7th Cir. 1986).

Aaron notes that § 207, entitled "Maximum Hours" sets forth the FLSA's overtime requirement, while § 213, entitled "Exemptions" contains many exemptions from § 207's overtime requirements. Aaron explains that wage-hour jurisprudence treats § 213 exemptions as affirmative defenses, but that the retail sales and service establishment exemption was moved from § 213 to § 207 decades ago. For this reason, argues Aaron, two courts have treated the subsections of § 207 as statutory requirements, not exemptions or affirmative defenses. *See*, *e.g.*, *Walton*, 786 F.2d at 307; *Brock v. City of Cincinnati*, 236 F.3d 793, 810 (6th Cir. 2001) (district court did not abuse discretion in entertaining city's § 207(k) argument, even though the defendant did not raise that issue until trial; applicability of § 207(k) "to a given case is a matter of law dictated by § 207(a) itself . . . rather than an 'exemption' in the nature of those in § 213(a), which employers must plead and carry the burden of proving apply to particular employees") (internal citations and quotations omitted).

Finally, Aaron also argues that even if this court decides to treat § 207(i) as an affirmative defense, it did not waive the defense. Pointing to the analysis of the Seventh Circuit in *Walton*, 786 F.2d at 307, Aaron asserts that in its Fourteenth Affirmative Defense of its Amended Answer, Aaron denies that it violated the requirements of § 207. In other words, in its Answer Aaron asserted that it did in fact comply with § 207, which would include § 207(i).

Admittedly, very little case law addresses this issue, and none in this Circuit. However,

14

Aaron has presented decisions from other courts that have held that § 207(i) is not an affirmative

defense, while Kuntsmann has not presented any case law to the contrary, and the court found

none. Therefore, this court finds that § 207(i) is not an affirmative defense that Aaron waived by

not specifically pleading it, and the court will now move on to address the merits of Aaron's §

207(i) argument.

2.      Application of the 29 U.S.C. § 207(i) Exception

The parties do not dispute that the first element of § 207(i), the retail or service

establishment requirement, is met. They disagree, however, about whether Aaron can show that

Kuntsmann's regular rate of pay exceeds one and one-half times the minimum wage and whether

Kuntsmann's compensation can fairly be deemed a  "commission" to meet the requirements of

the § 207(i) exception. In the Eleventh Circuit, the employer "bears the burden of proving the

applicability of an FLSA exception by 'clear and affirmative evidence.'" *Klinedinst*, 260 F.3d at

1254 (quoting *Birdwell*, 970 F.2d at 805).

a.      Regular Rate of Pay Exceeds One and One-half Times<br>MinimumWage

Kuntsmann claims that Aaron has not provided the court with any evidence that GMs are

paid more than one and one-half times the minimum hourly wage because it has not estimated

how many hours per week he worked. Without the number of hours worked, Kuntsmann argues

that Aaron cannot calculate an hourly wage and cannot calculate that the GMs are paid more than

one and one-half times the minimum hourly rate.

The Eleventh Circuit in *Klinedinst* ultimately remanded a § 207(i) case to district court

because neither the employer nor the employee in the case kept a record of hours that the

15

employee worked on a weekly basis. The court specifically stated that, "[t]he number of hours worked per week is a genuine issue of material fact for the factfinder." *Klinedinst*, 260 F.3d at 1257 (citing *Brennan v. Valley Towing Co.*, 515 F.2d 100, 111-112). Kuntsmann argues that because Aaron kept no records of his hours, then a question of fact exists as to whether the GMs meet the second requirement of the § 207(i) exception.

Here, neither Aaron nor Kuntsmann have produced a record of Kuntsmann's or any GM's weekly working hours. Kuntsmann argues that 29 C.F.R. § 779.420 requires any company who is claiming the § 207(i) exception to keep accurate records regarding each of the individuals for whom this defense is claimed, including a specific record of the hours worked by each employee. *See* 29 C.F.R.779.420, 516.16 (requiring "employers [to] maintain and preserve payroll and other records containing all the information and data required by 29 C.F.R. § 516.2(a)"). The only indication the court has of Kuntsmann's weekly working hours is based on his testimony that he worked "50-60" hours a week. (Doc. 222-21, at 77-79). Aaron correctly points out, however, that even accepting Kuntsmann's testimony that he worked sixty hours per week, his regular rate of pay would exceed one and one-half times the minimum wage. (Doc. 219, at 27).

Kuntsmann's annual salary was $55,000, and he claims that he worked 50-60 hours per week. This converts to a weekly pay of $1,057.69. Kuntsmann's regular pay based on a sixty hour work week and his weekly compensation would be $17.63 per hour. The minimum wage during Kuntsmann's time of employment was $5.85 per hour, and one and one-half times that is $8.78, making $17.63 well above one and one-half times the required minimum wage. Thus, although Aaron has not produced a record of Kuntsmann's weekly working hours, Kuntsmann's own testimony about his working hours and Aaron's record of Kuntsmann's compensation

16

proves that Kuntsmann's regular rate of pay exceeded one and one-half times the minimum

wage.  Aaron meets its "burden of proving" the second requirement of § 207(i) by 'clear and

affirmative evidence.'" *Klinedinst*, 260 F.3d at 1254 (quoting *Birdwell*, 970 F.2d at 805).

> b.      One-half of Compensation Earned Under Bona Fide
> Commission Plan

Kuntsmann denies that Aaron's compensation scheme can be considered a "bona fide

commission plan." Neither the FLSA nor the DOL's regulations provide a definition of

"commission" in this context. The Eleventh Circuit has stated that

> Whether. . . payments constituted commission is an issue of law. Yet, it is an issue
> that finds little illumination from the sparse case law and the vague references in
> statutes and regulations. Nonetheless, it is the duty of the courts to determine
> whether wage payment plans are in substantial compliance with FLSA. We
> undertake that duty by construing the remedial statutory provisions both narrowly
> and sensibly.

*Klinedinst*, 260 F.3d at 1254 (citing *Walling v. A.H. Belo Corp.*, 316 U.S. 624, 634-35 (1942));

*see also Brennan v. Valley Towing Co.*, 515 F.2d 100, 110 (9th Cir. 1975); *Birdwell v. City of*

*Gadsden*, 970 F.2d 802, 805 (11th Cir. 1992) ("holding that FLSA provisions are interpreted

liberally in the employee's favor and its exemptions construed narrowly against the employer.")

Aaron provides the following description of its compensation scheme:

> A General Manager's compensation plan is based on the revenue and
> operating profits of a store. A GM will receive a monthly level of income that
> approximates the anticipated financial performance of their store. This form of
> compensation is called a "draw." The "draw" system provides a set monthly
> amount of pay according to a published scale. After the close of the P&L's for
> June and Dec. a review is conducted to compare the draw amount to the actual
> earned compensation based on the financial results of the store. Pay adjustments
> are made where warranted. If the store performance exceeds the monthly draw - a
> positive adjustment is made. If the financial performance "pays" less than the
> draw - management has the right to reduce the draw amount.

> The monthly "draw" is a benefit to a GM - not a guarantee. The "draw"

forecasts what a store should financially produce at varying levels of revenue. Over a calendar quarter (3 months) the "draw" should approximate what the financial results of the store would produce in terms of compensation. Draws are increased when earned compensation based on financial performance consistently exceeds the draw.

("General Manager's Compensation and Performance Bonus Program," Doc. 221-1, Ex. 4, at 90).

In other words, a GM receives a pre-determined monthly "draw" based on the previous quarters' revenue of his store. In Kuntsmann's case, that monthly draw was $4,583.33, resulting in an annual salary of about $55,000. Aaron reviews the store's financial performance twice a year, and can either decrease or increase that monthly amount accordingly. In addition, after each quarter Aaron looks at the financial performance of each store, and will provide the GM a bonus if the GM's total monthly commission (calculated by adding together 2.5% of the store's net revenue and 16% of the store's net pretax profit) is greater than the GM's quarterly draw. GMs are also eligible for a monthly bonus of $200 and a quarterly bonus of $400 based on meeting certain financial goals. (*Id*. at 92).

The following chart describes Kuntsmann's compensation during the first quarter of 2008, which was the only quarter he worked as a GM:

|  | 2.5 % Revenue Commission | 16 % Profit Commission | Total Monthly Commission | Monthly Draw | Difference | Goal Bonus |
|---|---|---|---|---|---|---|
| Month 1 | $2,262 | $2,299 | $4,560 | $4,583 | ($23) | |
| Month 2 | $2,493 | $3,813 | $6,303 | $4,584 | $1,719 | $400 |
| Month 3 | $1,935 | $884 | $2,818 | $4,583 | ($1,765) | |
| Total | $6,689 | $6,992 | $13,692 | $13,750 | ($68) | $400 |

(Doc. 221-18, at 3). Aaron explains that for this quarter, Kuntsmann did not receive a supplemental commission payment because his commission earnings ("Total Monthly Commission") for the quarter did not exceed his draw. Had the "Difference" in the total column above been positive, he would have received a payment in that amount, because the quarterly commission payment is calculated by subtracting the quarterly draw from the earned commission.

Aaron argues that a "draw" system like this one constitutes a bona fide commission plan. The DOL Regulations expressly recognize compensation plans like the one at issue as being "bona fide" plans under § 207(I) – i.e., plans involving "straight commission" with "advances," "guarantees," or "draws." 29 C.F.R. § 779.413; *see also Bowman v. Builder's Cabinet Supply Co.*, 2006 U.S. Dist. LEXIS 62712, at *21 (E.D. Ky. Aug. 23, 2006). Some courts have held that some proportionality should exist between the compensation paid to the employees and the amount charged to the customer for the employee's compensation to be deemed "commission." *See Wilks v. Pep Boys*, 278 Fed. Appx. 488, 489 (6th Cir. 2008); *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173 (7th Cir. 1987)*; Mcaninch v. Monro Muffler Brake Inc.*, No 2:09-989, 2011 U.S. Dist. LEXIS 71827, *16 (S.D. Ohio July 15, 2011). Aaron argues that proportionality exists here because Kuntsmann's compensation as a GM derived from the sum of a percentage of his store's net revenue and a percentage of its profit.

In contrast, Kuntsmann argues that Aaron's "draw system" of compensation is not a "bona fide commission" plan under § 207(i). Kuntsmann explains that the Aaron system provides a set monthly amount of pay according to a published scale, which results in a pre-determined specific regular salary. In the instant case, Kuntsmann received the same amount of

compensation for each workweek. Kuntsmann argues that the regulations specifically state that

such a compensation plan does not fall under § 207(i).  *See Lee v. Ethan Allen Retail, Inc.*, 651 F.

Supp. 2d 1361, 1366 (N.D. Ga. 2009) ("The Code of Federal Regulations provides two examples

of commission rates that are not bona fide plans. *See* 29 C.F.R. § 779.416 (c). First, a

commission rate is not bona fide where 'the employee, in fact, always or most always earns the

same fixed amount of compensation for each workweek (as would be the case where the

computed commissions seldom or never equal or exceed the amount of the draw or guarantee).'

*Id*."). While Kuntsmann acknowledges that adjustments may be made to a GM's compensation

based on the relative financial success of the store, he asserts that such a scheme does not qualify

as a bona fide commission.

The two cases from this circuit that Aaron cites in support of its contention that its

compensation scheme qualifies as a bona fide commission plan are *Klinedinst v. Swift*

*Investments, Inc.*, 260 F.3d 1251 (11th Cir. 2001) and *Lee v. Ethan Allen Retail*, *Inc.*, 651 F.

Supp. 2d 1361 (N.D. Ga. 2009).  The Eleventh Circuit described the compensation scheme at

issue in *Klinedinst* as follows:

> Swift avers that the flat rate system it utilized is a form of commission, which is
> incentive-based and encourages efficiency and speed. Klinedinst was assigned an
> hourly rate (flag rate) for a particular task, but if it took longer than the allotted
> time, he would no be paid extra. If he completed the task sooner, however, he
> would keep the difference. For example, deposition testimony reveals that
> whether a technician took ten or thirty hours to complete a job, he would still be
> paid the same. Specifically, Swift determined Klinedinst's compensation per job
> by multiplying the predetermined flag hours by his hourly rate. He was to receive
> compensation under this formula regardless of whether he actually worked the
> predetermined flag hours. The flat rate of pay was not the hours of time it actually
> took the worker to complete a job. It is a method of providing employees with an
> incentive to "hustle" to finish their jobs in order to obtain a larger number of jobs
> for greater compensation.

260 F.3d at 1254-55.

The Court later described the "purpose or logic behind overtime" in explaining why it

held that the payment plan at issue constituted a commission:

> The flat rate at issue (1) provides workers with an incentive to work quickly,
> while (2) paying them at a rate that exceeds minimum wage. The function of a
> commission exemption as embodied by section 7(i) is to ensure that workers who
> are paid on a commission basis are guaranteed to receive at least the legislated
> minimum wage without requiring them to work overtime for it. See 29 U.S.C. §
> 207(i). Payments of between $12 and $15 per flagged hour provide incentives for
> employees to work efficiently and effectively to the benefit of the employer, who
> may then take on  more customers at a greater profit margin, and the employee,
> who reaps the benefits of increased flag hours regardless of the actual amount of
> hours worked. With this in mind, we conclude that Klinedinst's flag rate wages
> constitute a "commission". . .

*Id*. at 1256.

The compensation scheme examined in *Klinedinst* is distinguishable from the one at issue

in the present case. The Eleventh Circuit emphasized the importance of time as a factor in the

*Klinedinst* compensation scheme; time does not play a role in the compensation of an Aaron's

GM. In addition, inherent differences appear between how the auto mechanics in *Klinedinst* and

the GMs at Aaron earn their compensation. The auto mechanics' compensation derived  from

each individual job that they performed that was assigned a particular number of "flag hours."

The connection between individual sales and the compensation of an Aaron GM is much more

attenuated, however. At Aaron, GMs are neither paid on a "per job basis," nor an hourly basis but

a monthly compensation based on previous quarters' revenue that could possibly be increased or

decreased based on the store's profits. The payment system in *Klinedinst* is different enough

from the Aaron compensation scheme so that the opinion does not guide this court's analysis as

to whether Aaron's payment scheme meets the final requirements of § 207(i) at the summary

judgment stage – whether its compensation scheme qualifies as a bona fide commission plan.

Aaron also cites *Ethan Allen* to support its contention that its compensation scheme qualifies as a bona fide commission plan, but the payment scheme in that case is also distinguishable from Aaron's plan. The district court in *Ethan Allen* described the compensation scheme at issue in that case as follows:

> Design Consultants, including Plaintiff, are paid on a commission basis. They are never paid a salary. After an initial two week training period, Plaintiff began making sales and earning commissions. Ethan Allen paid Plaintiff according to its written Design Consultant Compensation Plan ("Compensation Plan"). Pursuant to this Compensation Plan, Design Consultants earn a minimum of 7% commission on net written sales per fiscal month. The commission increases to 8% at $55,000 and 9% at $70,000. Design Consultants earn a commission on every dollar of their sales; there are no caps on the amount of commissions a Design Consultant can earn.

651 F. Supp. 2d at 1363.

The compensation scheme at issue in *Ethan Allen* is very different from that utilized by Aaron. The plaintiff in *Ethan Allen* was *only* paid on a commission basis; the only money she received came from each individual sale she made, and she was "never paid a salary." *Ethan Allen*, 651 F. Supp. 2d at 1363. Again, the connection between individual sales and an Aaron GM's compensation is much more attenuated.

A great difference exists between simply adding up total sales attributed to a salesperson each month and then giving the salesperson a certain percentage of those sales in compensation, and awarding a store manager a "bonus" if his store's profits exceeded the company's predictions. As Kuntsmann argued, his monthly salary was based on a published rate and did not change based solely on his sales or the store's sales alone. The payment system in *Ethan Allen* diverges enough from the Aaron compensation scheme so that the opinion does not direct this

22

court's analysis as to whether Aaron's scheme qualifies as a bona fide commission plan under §
207(i).

Therefore, this court finds that Aaron has not demonstrated that its compensation scheme
qualifies as a "bona fide commission plan." 29 U.S.C. § 207(i).  Although some circuits have
doubted the validity of the "clear and affirmative evidence" standard,[2] the Eleventh Circuit has
not retreated from this standard, and Aaron has not met it regarding the applicability of the
§ 207(i) exception. Moreover, regardless of how exacting Aaron's burden should be when
proving the applicability of an FLSA exception, the Eleventh Circuit has also instructed this
court to construe FLSA exceptions "narrowly and sensibly." *Klinedinst*, 260 F.3d at 1254. After
narrowly construing § 207(i), the court has serious doubts as to whether Aaron' compensation
scheme qualifies under the statutory section. While recognizing that determining whether a
compensation system qualifies as a bona fide commission plan is a question of law for the court,
Aaron has not met its burden of proof at this stage.

IV.      CONCLUSION

Because genuine issues of material fact exists in this case and because Aaron has not
demonstrated that it properly classified Kuntsmann as exempt from the FLSA's overtime
provisions or compensated him in accordance with 29 U.S.C. § 207(i),  Aaron's Motion for
Summary Judgment is DENIED.

---

[2] *See*, *e.g.*, *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 506-07 (7th Cir. 2007).

23

DONE and ORDERED this 4th day of October, 2012.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE